# MARYLAND REPORTS.

## *THE PARK TAX CASE.

*Street Railways—Franchise Tax upon Gross Receipts for Mainte-
nance of Parks—Liability to Taxation of Company where Tracks
are upon a Turnpike Road or Private Property in Annexed Dis-
trict.*

The tax upon the gross receipts of street railway companies in Balti-
more City, imposed by municipal ordinances and an Act of the Leg-
islature for the maintenance of public parks, is a franchise tax ex-
acted in exchange for the privilege given to the companies to run
their cars upon streets subject to the control of the city.

A company operating a suburban railway upon a turnpike road within
the limits of the city as extended since the Act of the Legislature
imposing the tax, when the right to use the turnpike was acquired
by the railway company by purchase from the turnpike company, is
not liable to said tax, since such railway does not occupy any street
subject to the control of the municipality.

Under the Acts of 1882, ch. 229, and 1894, ch. 550, the Mayor and
City Council of Baltimore are not authorized to impose a gross re-
ceipt tax on passenger railway companies, whose tracks are not lo-
cated upon city streets, but wholly upon private property or turn-
pike roads acquired by the railway companies by purchase or con-
demnation, and when such companies have received no municipal
franchise or concession.

Appeal from a judgment of the Baltimore City Court
(PHELPS, J.), where the case was tried upon an agreed
statement of facts, upon an action brought by the appellant
against the appellee.

The cause was argued before McSHERRY, C. J., BRYAN,
FOWLER, BRISCOE, PAGE and RUSSUM, JJ.

---

*The docket title of this case was *The Mayor and City Council of Baltimore* vs.
*The Baltimore, Catonsville and Ellicott's Mills Passenger Railroad Company.*

*Thomas G. Hayes, City Counsellor,* and *William S. Bryan, Jr.,* (with whom was *Thos. Ireland Elliott, City Solicitor,* on the brief), for the appellant, the Mayor and City Council of Baltimore.

It will aid in understanding the city's position, if we take a cursory view of the history of the park tax, and trace it from its inception in the City Passenger Railway Company's ordinance of 1859 to its present state. In the ordinance authorizing the City Passenger Railway Company to lay its tracks (Ordinance 44, of March 28, 1859, section 14; City Code of 1879, Art. 40, sec. 40), the provision in regard to the park tax was as follows: "The said company shall, by their treasurer, under oath, pay into the hands of the City Register, quarterly, one-fifth of the gross receipts accruing from the passenger travel upon said roads located *within the city limits* under this ordinance, or *any extension of said limits* which may be determined upon hereafter, the same to be applied to the establishment and improvement of the city boundary avenue, and to the location, purchase and improvement of such park or parks as may be determined upon hereafter by the Mayor and City Council of Baltimore, for the benefit of the people of said city; said park or parks to comprise an area of not less than fifty acres each; and the said Mayor and City Council shall have the power on the completion of said improvements to reduce the rate of fare on passenger travel to such limit within the range of one-fifth of the gross receipts of said road as they may deem expedient and advisable, the city at the same time relinquishing its interest in the receipts from said road to the extent of said reduction on said fare."

The provision in regard to the tracks of the Citizens' Railway Company, now a part of the Traction Company's lines, was section 8 of Ordinance 70, of July 9, 1868, (City Code of 1879, Article 40, section 66), and read as follows: "The aforesaid grantees, by their treasurer, under oath, shall pay into the hands of the City Register, quarterly, one-fifth of the gross receipts accruing from the passenger

travel upon said roads, or any extension thereof which
may be determined upon hereafter, the same to be used
and applied to the park fund."

The provision in regard to the Baltimore, Peabody
Heights and Waverly Railroad (City Code of 1879, Art. 40,
sec. 82) provided for a park tax of one-fifth of the gross
receipts "from the passenger travel *on the line of said rail-
way.*" The York Turnpike Co., the People's Ry. Co., and
the Baltimore Union Passenger Ry. Co. were required to-
pay one-fifth of the gross receipts accruing from passenger
travel within the limits of the city.

It will thus be seen that it was required by the *municipal
authorities* when the concession was first granted to each
and every street railway company to lay their tracks upon
the public streets, that they should pay a park tax. This
was the settled policy of the city, and as the various legis-
lative Acts either simply confirmed the ordinances or con-
firmed them with trifling and immaterial changes in matters
of detail, this policy was not disturbed or interfered with
by the State authorities. It will be seen that the terms on
which the gross receipt tax of, first twenty, and then twelve
per cent. was exacted as a price of the right to use the
public streets, and do their private business on the public
highways, varied in the various ordinances. In the ordi-
nance of the Union Railway Company, for example, it was
on the gross receipts "within the city limits;" on the
other hand, in the ordinance of the Citizens' Railway Com-
pany, it was on the "gross receipts accruing from passenger
travel upon said roads *or any extension thereof which may be
determined upon hereafter.*" And again, as in the case of the
Baltimore, Peabody Heights and Waverly Railroad, the tax
was to be laid on "the gross earnings from passenger travel
*on the line of said railway.*" So that some of the railways
had, by the terms and conditions of the initial grant to them,
to pay the tax on their gross receipts from their lines.
within the city limits only, while others were required to
pay upon their gross receipts from any lines wherever situ-

ated.   The reason for the different rule in the case of the different companies was simply that it had seemed proper to the City Council to so ordain.

In 1882, the State for the first time stepped in and took the matter of the park tax out of the hands of the city ; and by enacting chapter 229, of the Acts of that year, reduced the park tax from twelve per cent. to nine.   The first section of that Act regulated the amount to be charged for fares and transfers ; and the second reduced the park tax to nine per cent.   In making this reduction, the Legislature was careful, however, to preserve the rights of the city and of the several roads undisturbed, except in the reduction of the tax from twelve per centum to nine.   The second section of the Act read thus :  '' In lieu and substitution of the twelve per cent. tax now imposed upon and payable by the said several passenger horse railway companies mentioned in the preceding section, that the said several passenger horse railway companies shall pay to the Mayor and City Council of Baltimore a tax upon their gross receipts of nine per cent. *to be paid at the same time and in the same manner* as the tax of twelve per cent. is now paid by said companies.''

When the law was in this condition, the Annexation Act of 1888, chapter 98, was passed, providing for the annexation to Baltimore City of the portion of Baltimore County lying adjacent thereto, and particularly described in three several parcels by metes and bounds in the Annexation Act.   The people voted for the annexation of the northern and western of these sections, and the territory described in them became a part of Baltimore City from and after June 1st, 1888. *Acts of 1888*, chap. 98, sec. 6.

As before said, the gross receipts, the percentage on which is here sued for, are derived from the lines in this annexed belt.   The eleventh section of this Annexation Act provided that all the provisions of Article Four of the Code of Public Local Laws of Maryland, entitled " City of Baltimore," *shall be and the same are hereby extended and*

*made applicable to such portions of Baltimore County as shall,
under the provisions of this Act, be annexed to and made a
part of Baltimore City.* By virtue of the effect of this sec-
tion, the Act of 1882, chapter 229, relating to the park
tax, became applicable to the annexed district, and those of
the local passenger railway companies, whose park tax was
to be paid on their lines " within the city limits," were re-
quired to pay that tax upon their lines within the *new* city
limits. Of course, those companies which were by their
grants required to pay on all their lines wherever situate
were not affected, as it has all along been their duty to pay
upon their entire lines, whether in the city or out of it.

The correctness of the contention that the extension of
the city limits made the requirement of the payment of the
park tax on the gross receipts from " within the city limits"
*mean the present limits of the city as extended,* is manifest,
not only from the express and plain words of section 11 of
the Annexation Act above quoted, but also from the follow-
ing considerations :

The ordinances granting the privilege of laying and
maintaining the tracks were *grants* in the nature of licenses
from the public to the corporations to whom they were
made. At this day, it is not an open question in Mary-
land that all public grants are to be construed strictly
against the grantees and in favor of the public. *North
Balto. Pass. Railway Co.* v. *North Ave. Railway Co.,* 75
Md. 243 ; *Horse Railway Co.* v. *Interstate, &c., Co.,* 24
Fed. Rep. 308 ; *Stein* v. *Bienville Supply Co.,* 141 U. S.
80, 81 ; *B. & O. R. R. Co.* v. *State,* 45 Md. 611. Besides
this, the very question has, in effect, been decided by the
Court of Appeals in the recent case of *Baltimore* v. *Turn-
pike Co.,* 80 Md. 535.

The fact that this extension of the lines from which the
park tax was to be paid might increase the public burdens
of the street railway companies affected thereby, can make
no difference. Since the " reserve clause " providing for
the amending, altering and repealing charters of corpora-

tions was inserted in the Constitution of Maryland in 1851, there has been no open question that it is lawful for the Legislature at its pleasure to require an enlargement of their burdens or a curtailment of their privileges. This was expressly decided in *American Coal Co.* v. *Consolidated Coal Co.*, 46 Md. 20; see also *Lake Roland Elevated Railway Co.* v. *Baltimore*, 77 Md. 352; *Greenwood* v. *Freight Co.*, 105 U. S. 13; *West Wisconsin R. R.* v. *Supervisors*, 35 Wisconsin, 257; *English* v. *New Haven and Northampton R. R.*, 32 Conn. 240; *Worcester* v. *Norwich Railway Co.*, 109 Mass. 103; *Sioux City Street Railway Co.* v. *Sioux City*, 78 Iowa, 78; *Same case on Appeal*, 138 U. S. 98; *Erie & N. E. R. R.* v. *Casey*, 26 Pa. St. 287.

The Local Code of 1888 provided in Art. 4, sec. 769: The said several passenger horse railway companies shall pay to the Mayor and City Council of Baltimore *a tax upon their gross receipts* of nine per cent. in quarterly instalments on the first day of January, April, July and October, in each year.

It will be noted that after this Code went into effect " *each* of the several passenger horse railway companies *in the city of Baltimore*" shall only charge five cents fare from " any point on any line of its railway to any other point on such line *within the city of Baltimore.*" This section manifestly embraced within its provisions every horse railway company within the city, whether it had before been subject to this regulation in regard to fares or not. And in the next section, when " the said several passenger horse railway companies " are spoken of, it is too obvious to require any demonstration, that reference is had to the class (neither more nor less) set forth in the preceding section.

When, therefore, section 769 of Article 4, Public Local Laws, required *in general terms*, that the horse passenger railway companies " shall pay a tax upon their gross receipts of nine per cent.," it is very clear that this meant *all* the horse passenger railway companies, of which the defendant was undoubtedly one. I. Because if it did not

mean this, there would have been no reason for making the pointed change in the phraseology of the law. II. Because the familiar rule of grammar is that where anything is predicated of a class of things generally, it is intended to include the entire class. " Men are mortal," means " all men are mortal." So " a tax upon their gross receipts " means " a tax upon *all* their gross receipts." III. It was expressly adjudicated before the change in the law and, therefore, the change must be supposed to have been made in the light of that decision (*Glenn's case*, 54 Md. 596 ; *Central Savings Bank case*, 67 Md. 295), that a general franchise tax on the gross receipts of a railroad would apply as well to the receipts from that part of the railroad which is beyond as to that part which is within the limits of the State. *B. & O. R. R.* v. *State*, 45 Md. 596.

Great stress was laid in the opinion of the learned Judge in the Court below upon the possibly unfortunate use of the words " street railway" by the draughtsman in this Act of 1894, and from that fact and the further fact that sections 768 and 769 in the Code are placed under the sub-title " *Street Railway Fares*," the conclusion was deduced that the park tax was not collectible from those portions of these local passenger roads which, like the defendant, lie upon turnpike roads or upon private rights of way acquired by purchase.

But if the use of the term " *Street Railway*" in that Act could have any effect upon the taxation imposed by the language of the Code, the following considerations are respectfully submitted. The term " Street Railway " as used in chapter 550, Acts of 1894, was evidently intended to be descriptive of the roads referred to in sections 678 and 679 of the Local Code. It was the evident purpose of the Legislature that these new sections here added, should refer to the same class of railway companies as were mentioned in the sections to which those newly enacted were to be subsidiary. " Like many other words, its precise meaning and signification depend somewhat upon the subject-

matter in connection with which it is used." (80 Md. 542). *Noscitur a sociis.* Again, the term "Street Railway" does not mean simply a railway on a street. If it did, the Baltimore and Ohio Railroad, and the Northern Central Railway for part of their lines would be street railways, for they are undoubtedly railways upon streets. A street railway means a particular kind of railway; the kind and character of railway, for passengers and not for freight, that is habitually permitted to run upon streets, and the running of which upon a street is not an additional servitude. (75 Md. 229; 58 Md. 619). That it does not necessarily have to be within the limits of an incorporated town is shown by the use of the term both in the Maryland Reports, in Acts of Assembly, and in common parlance.

While it is true that the city, so far as appears in the record, has never granted the defendant any franchises, *the State has;* and this tax is imposed by the State, and is used not for the benefit of the city as a corporation, but as a trust fund to maintain a park for the health and pleasure of the people. The State gave, as we have seen, to this defendant, the very valuable franchise of using a public highway for its roadbed, which it never could have done without this State grant. The Court of Appeals has said, speaking of the franchise of a street railway coming from the State, "though the franchise can only be exercised in such mode as the city which has absolute control over its own streets may by reasonable regulations prescribe." *State* v. *Latrobe,* 81 Md. 241. It is no answer to this to say that the defendant had also to pay the turnpike company for this privilege, because, after obtaining the assent of the turnpike company, it would have been a public nuisance to have erected or maintained the railway upon the road without legislative sanction. That the defendant thought it a valuable privilege to be allowed to agree with the turnpike for the use of the highway is manifest from its electing to do so rather than condemn its own right of way through private property.

*E. J. D. Cross* and *Francis K. Carey* (with whom were *John K. Cowen, H. L. Bond, J. N. Steele* and *J. E. Semmes* on the brief), for the appellee, the Baltimore, Catonsville and Ellicott's Mills Passenger Ry. Co.

1. The railway of the appellee is not included within the class of railways to which the park tax legislation relates, and the park tax has not been imposed upon it, either by the Annexation Act, or by the adoption of the Code of 1888, or by the Act of 1894, chapter 550. It appears from a fair and reasonable construction of all the legislation relating to the park tax, that it is a tax imposed upon the *street* railway lines of Baltimore City for the use of city streets maintained at public expense, which streets have come into the possession and under the control of the city, either by grant or dedication, or have been opened by condemnation, so as to give either the municipal corporation or the General Assembly the right to grant or refuse to grant railway franchises upon them.

The correctness of this definition of the park tax appears, *first*, from the history of the park tax ; from the title " *Street* Railway Fares," under which the park tax provision is codified, and from all the circumstances surrounding its imposition and which may be presumed to have controlled the *intention* of the Mayor and City Council and the General Assembly ; *second*, from the construction placed upon the words " park tax " in the *Union Passenger case*, where it is declared to be a tax " imposed for the privilege accorded by the city   *   *   *   of using *its streets* for railway purposes ;" *third*, from the express language of the Act of 1894, chapter 550, where the tax is in express terms confined not only to " *street* railway companies," but to the " *street* railway lines " operated by such companies ; and, *fourth*, from the nature and character of the tax. A railway like that of the appellee, which is not operated upon any city streets, but which extends for long distances into the open country upon its private rights of way, purchased and maintained at its own expense, and which does not charge *street* railway fares, but

special fares authorized by its charter, is not a *street* railway within the meaning, purpose and scope of the law imposing the tax.

2. The railway of the appellee is located within the annexed district of Baltimore City, and the terms of the Annexation Act the city is forbidden to collect the park tax from railways within the annexed district until after the year 1900.

The purpose and legal effect of the Annexation Act was to induce persons and corporations residing, doing business or owning real and personal property in the territory proposed to be annexed to Baltimore City, to consent to the annexation, in consideration of a legislative promise, to the fulfilment of which the honor and good faith of the State is pledged, that until after the year 1900 the real and personal property of such persons and corporations should be taxed at the rates and in the manner then prevailing in Baltimore County. An exemption of stock from taxation involves an exemption of franchises and an exemption of gross receipts. The stock of the appellee is personal property, and as such, shares in the benefit of the qualified exemption. It follows that the Annexation Act exempted the gross receipts of the appellee from taxation until the year 1900. The franchises of a corporation are part of its personal property, and in the case of a railway company the most valuable part of its personal property, and it involves a contradiction in terms for the State to invite a railway corporation to consent to a new territorial division, with the understanding that its real and personal property shall not be subject to an increased taxation for a stated period, and then to claim that the change of territorial lines, based on that understanding, has of itself imposed a new and exorbitant tax on its franchises. In construing an exemption of this character, which is part of a general scheme of taxation, and which is based upon the consideration of a supposed public benefit, it has been universally held that the exemption must be liberally construed so as to preserve to the subject the " substantial benefit," the promise of which was intended to induce and did in fact induce the subject to alter his position.

The railway tracks of the appellee are laid upon private rights of way, purchased from the president, managers and company of the Baltimore and Fredericktown Turnpike Road. Two miles of its road are within the annexed district. For about one mile the turnpike road is improved on both sides with scattered rows of small brick dwellings and saloons, and small detached frame shanties. The second mile traverses an open country district, on a typical country road, passing large country seats and extensive tracts of unimproved land. The appellee is authorized by law to charge thirty-five cents for the carriage of passengers between its terminal points. In 1890, after the passage of the Annexation Act and prior to the passage of the Act of 1894, the appellee became insolvent because of its inability to earn its fixed charges from its passenger receipts, and its franchises were sold under its mortgage in 1893. At the time of the passage of the Act of 1888, chapter 94, extending the corporate limits of Baltimore City, no part of the railway of the appellee was within the corporate limits of Baltimore City. The appellee was incorporated and organized under an Act of the General Assembly, and it has been decided by the Court of Appeals, and it is conceded by the appellant, that at the time of the passage of the Annexation Act the appellee was not liable to the payment of any park tax, because it was operated and maintained outside of the then limits of Baltimore City, and because by the express terms of all legislation relating to the park tax, it was excluded from any such liability. It is also conceded by the appellant that the appellee is not now liable for the payment of a park tax unless its charter had been amended either by the Annexation Act of 1888, or by the Act of 1894, chapter 550; the latter Act being an Act passed for the purpose of permitting the Mayor and City Council of Baltimore to examine the books of those railway corporations which were then liable for the payment of the park tax. It is conceded by the appellee that it is competent for the Legislature to amend its charter, and that an

amendment of a charter can, under some circumstances, be
effected by general legislation, which does not in terms
refer to the particular corporation, in regard to which the
question is made.    It is, however, a principle of law that
special legislation is not altered by subsequent general leg-
islation, unless the language of the general legislation is so
plain as to forbid any other hypothesis.    It is also a settled
principle of law that a tax cannot be imposed by implica-
tion, and that unless a tax is imposed in express language
the presumption of law is that it has not been imposed at
all.    At the time of the passage of the Annexation Act the
only general legislation referring to the payment of the park
tax was the Act of 1882, chapter 229, entitled "An Act to
secure the benefit of a five-cent fare upon the passenger
horse railways in the city of Baltimore."    This Act was by
its terms confined to a particular class of railways operating
within the old limits of the city of Baltimore, all of which
railways were then paying a park tax of twelve per cent.,
and by the terms of that Act the park tax was reduced to
nine per cent., with the proviso that none of said railways
should charge more than five cents for adults and three
cents for children within the then limits of Baltimore City.
Apart from the claim of the appellee, that the Annexation
Act protected it from the payment of the park tax at least
until the year 1900, it is clear that the Annexation Act can-
not be construed as an amendment of the charter of the ap-
pellee, so as to subject it to the operation of the Act of 1882,
chapter 229.    It is true that by the Annexation Act a large
part of the appellee's railway, which was formerly in Balti-
more County, is now in Baltimore City, and that the Act
of 1882, chapter 229, includes in its terms "the several
passenger horse railway companies in the city of Balti-
more," but the railway of the appellee was not included
within those referred to by that Act, not only because it
was not within the territorial limit, but because also it was
not within the class of railways sought to be affected by it,
and it was not and could not have been the intention of

the Legislature which passed the Annexation Act to sub-
ject the appellee to the payment of a tax designed only for
the five-cent-fare street railways within the built-up portions
of the city, which received their franchises to lay and main-
tain their tracks from the public, and which used for that
purpose public highways, opened and maintained at public
expense.  It has been decided by the Court of Appeals that
the park tax was "imposed for the privilege accorded by
the city   *   *   of using its streets for railway purposes."
It is well settled that the intention of the Legislature, taken
in connection with surrounding circumstances, which may
be supposed to have influenced that intention, will prevail
to exclude a particular class of corporations from the effect
of general language, which is broad enough in its terms to
include this special class.   But by the express terms of the
Annexation Act the appellee, with other individuals and cor-
porations, residing or doing business within the limits of
the annexed district, was protected from any change in the
rate, manner or form of taxation which prevailed in Balti-
more County at the time the annexation was consummated,
and the defendant company made no effort to oppose the
annexation, because, in the language of the Court of Ap-
peals, it relied " upon the good faith of the State not to re-
peal the qualified amendment granted under such circum-
stances."   It having been distinctly decided in this State
that an exemption of the shares of stock of a corporation
exempts its franchises from taxation ; and it having been
also decided that a tax upon gross receipts is a tax upon
franchises, and it being conceded that the stock of a cor-
poration is personal property, and the Annexation Act hav-
ing in terms exempted all the personal property of persons
and corporations doing business in the annexed district
from any increased taxation, it follows as a necessary con-
clusion that by the express terms of the Annexation Act the
defendant company is protected from the city tax upon its
franchises and is not, therefore, liable for the payment of
the park tax.

*John Prentiss Poe* and *Fielder C. Slingluff* filed an additional brief in support of the judgment of the Court below.

McSHERRY, C. J., delivered the opinion of the Court.

The question involved in this case is clearly stated in the following terms by the learned Judge whose rulings are now before us for review:

"The defendant company operates a local passenger railway, running for a part of its length (about two miles) through the annexed district, or within the present territorial limits of the city as extended, and for the rest of its length (about three and one-half miles) westwardly beyond those limits, and for the whole of its length on its own right of way, acquired and maintained at its own expense. This right of way it has purchased from the turnpike company upon whose roadbed its tracks are laid, under legislative authority. No street franchise or concession of any kind whatever has been conferred upon it by the city. Its tracks are not laid upon, nor does it use, nor has it received any municipal privilege upon any city street or streets acquired by the city by grant, dedication or condemnation, or in any other way, and maintained at public expense. The question is, whether such an enterprise properly answers to the description of a street railway within the intent of the laws imposing the park tax of nine per cent. upon gross receipts from all street railway lines within the present city limits?"

The appellee company is the successor of the Baltimore, Catonsville and Ellicott's Mills Passenger Railway Company. This latter company was incorporated by the General Assembly of Maryland under an Act passed at the January session of 1860, ch. 34. By authority of this Act the corporation thereby created constructed a single track horse railway upon the bed of a turnpike road owned by the president, managers and company of the Baltimore and Fredericktown Turnpike Road, after first, by agreement, procuring for a money consideration, the right of way from the turnpike company. The railway thus constructed was

located wholly in Baltimore County, with one terminus just at the city limits. Some thirty years afterwards this railway company became embarrassed financially and its property was sold under foreclosure proceedings, and the present appellee was the purchaser and assumed the same name, with the single exception that the word railroad was substituted for railway. The re-organized company—the appellee—having determined to change the motive power for the propulsion of its cars from horses to electricity, was empowered under the Act of 1894, ch. 162, to contract with the turnpike company for the amount of compensation to be paid to the latter for the use of its roadbed by this different and more rapid method of transit. Conformably to this Act the right to use the turnpike roadbed for an electric railroad was acquired by agreement for the sum of twenty-eight thousand dollars in money and the further consideration of the performance of certain stipulations which need not be stated or considered, as they are not material in respect to the pending controversy.

By ch. 98 of the Acts of 1888 the limits of Baltimore were extended and part of the railway now owned by the appellee and theretofore built by its predecessor was brought within the enlarged outlines of the city.

When permission was first given by the Mayor and City Council in 1858, by ordinance, to certain individuals to construct a passenger railway upon some of the city streets and to run thereon cars drawn by horses, a tax of one-fifth portion of the whole passenger receipts was exacted; and when in 1862 these same individuals secured from the General Assembly an Act incorporating the Baltimore City Passenger Railway Company the exaction of one-fifth of the gross receipts was embodied in the fourth section of the charter. As succeeding street railway companies were formed a like tax was imposed upon them by the city. In 1874, by ordinance, the rate of this tax was reduced to twelve per cent., and in 1882 the Legislature, by chapter 229, provided "that each of the several passenger horse

railway companies in the city of Baltimore shall charge five cents and no more" for conveying each passenger, &c.; and by the second section, "that in lieu and substitution of the twelve per cent. tax now imposed upon and payable by the *said* several passenger horse railway companies mentioned in the first section of this Act, the said several passenger horse railway companies shall pay  *  *  a tax upon their gross receipts of nine per cent., &c." This tax is what is known as the park tax, and, up to the time of the annexation to the city of the outlying belt in 1888, was imposed upon and collected only from street railway companies upon the basis of their receipts within the city limits.

Since the decision by this Court of the case of *Balto. U. P. Ry. Co.* v. *M. & C. C. Balto.*, 71 Md. 405, there can be no question that the tax thus imposed was laid and collected in consideration of the privilege or franchise granted by the city to the several street railway companies to lay their tracks and to run their cars upon the public thoroughfares of the city. "The nine per cent. tax  *  *  has been imposed for the privilege accorded by the city to the appellant of using its streets for railway purposes." 71 Md. 413. There is no pretence that the tax was ever imposed or collected either in respect of gross earnings received from suburban travel, or in respect of such earnings accrued to any other railway than one located and operated upon a public *street* of the city. The history of the legislation relating to this subject would, apart altogether from the explicit language used in 71 Md. *supra*, be sufficient to demonstrate, we think, that the tax was a franchise tax exacted in exchange for the privilege accorded these several companies to lay their rails and run their cars upon city streets—streets subject to the control of the Mayor and City Council of Baltimore and subject to no other dominion whatever. This is emphasized by the ordinance which reduced the rate of the tax to twelve per cent., for it provided that the several railway companies named in it (and the appellee is *not* included) should be required to pay to the City Register twelve per cent. of their

gross receipts " in lieu of the one-fifth as now required under their respective *grants.*"   Clearly this language indicates, if it does not expressly declare, that the tax was the equivalent for the *grant;* and consequently if there were no grant there was to be and in reality was, no tax.   When subsequent legislation spoke of streets in connection with this class of railways, it manifestly meant *streets* and not private rights of way.   It would do violence to the words employed in the Act of 1894, ch. 550, relating to this subject, and would ignore the distinctive character of the tax itself, if the term *street railway* were stretched so far from its natural and primary meaning as to force it to include railways, that though operated like street railways, are in fact not built upon and do not occupy streets at all.

As the Act of 1888 has brought a part of the appellee's tracks within the new limits, it is insisted by the city that the appellee became liable to pay this tax upon the earnings received from that part of the road, solely because of the extension of the city outlines, even though the turnpike road still continues a turnpike road and has not become a street at all.   But the obvious answer, it seems to us, is that appellee's road was not constructed upon a street of the city ; is not now located on such a street ; but was built upon and still occupies its own purchased right of way over which the city has not now and never has had control ; and as to the occupancy of which the city could not confer and never undertook to confer on the appellee any right or privilege whatever.   A permission given by the city to the appellee to locate its tracks upon their present site, along the bed of the turnpike, would have conferred no right or authority to construct the road where it is now located.   That right and authority were derived from the Legislature and from the turnpike company.   If, then, no right was conferred by the city—and confessedly there was not—for the tracks were laid long before the city's limits embraced any part of the territory through which the appellee's railway runs, the city gave nothing to the appellee in exchange for which it could

lawfully exact the franchise tax; and in this vital particular the appellee differs widely from the old lines constructed within the city and upon the beds of the city's streets. The extension of the city limits gave to the appellee no rights or privileges which it did not have before. It granted to the company no authority it did not already fully possess and enjoy. If the appellee held, before the Act of 1888, none of its rights as to the occupancy of the turnpike by grant, license or permission from the city; and if it acquired from the city since the extension no other rights than it had before; there can be no ground upon which the claim to collect the tax can be placed unless it be that the Act of 1882, and a subsequent Act of 1894, ch. 550, have authorized the city to impose a gross receipt tax for the benefit of the city without regard to whether the railway be located on a city street, on a turnpike road, or wholly on private property acquired by the company through purchase or condemnation. There is no such intention manifested in either of the statutes referred to, and we are not, in our judgment, authorized to expand by sheer implication a tax burthen of this kind so as to make it include an object, or speaking more accurately a person, natural or artificial, obviously not within the scope of the original scheme devised to raise revenue for the maintainance of the parks. Without going into any of the other questions discussed at the bar and in the elaborate briefs filed, it seems to us no valid reason can be assigned for holding that the appellee is now liable to pay this gross receipt or park tax. The road does not answer the description of the class of railways heretofore subjected to the tax; and this is so because it never was and is not now located on a *street* of the city.

In our judgment the rulings below were right, and the judgment appealed from should be affirmed.

*Judgment affirmed with costs above and below.*

(Decided June 19th, 1896).