MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

*vs.*

THE UNITED RAILWAYS AND ELECTRIC COM-
PANY OF BALTIMORE.

*Act of* 1906, *Ch.* 566; *United Railways*: *Park Tax; special leg-
islation; apportionment of taxes.*

Prior to the Act of 1906, Ch. 566, it had been decided that
the company's easements, not on public streets, were exempt
from park tax (nine per cent of gross receipts) imposed by law
on its public easements. By said Act of 1906 provision was
made for the acquisition by the City, through condemnation
proceedings (but, in effect, at a nominal valuation) of these
private easements; and it was further provided that the com-
pany might receive from the City a new easement in perpe-
tuity where the easement condemned was of that nature; and
that the new easement should be exempt from park tax for
three years and thereafter subject to a gradually increasing
rate beginning with one per cent. Subsequently (111 Md. 264)
it was decided that the park tax was intended by the Legisla-
ture to exclude any further taxation of the company's public
easements; that the private easements were subject to assess-
ment and taxation as real estate; but that the assessment
appealed from was illegal and void. Thereupon, by a settle-
ment between the City and the company, the latter submitted
to an assessment of $500,000 on its private easements, and it
was agreed that as the same should be taken over by the City

40   M. & C. C. OF BALTO. vs. U. RWYS. & E. CO.

Syllabus.                                              [126

and become subject to the graduated park tax under the Act of 1906, Ch. 566,—the $500,000 easement assessment should be proportionately abated. Subsequently, and after having acquired for a nominal consideration certain of the company's private easements thereunder, the City attempted to repudiate the Act of 1906 and the settlement above set forth;—alleging that the Act was unconstitutional as special legislation, and that, even if the Act were valid, the easement tax could not be apportioned for any fiscal year as the agreement of settlement provided:

*Held*: That the Act of 1906 was unquestionably primarily intended for the benefit of the City; and that it was not a case of the company getting special advantages without paying for them; it was the City that was profiting by the arrangement.

p. 52

The Act is not invalid as special legislation, merely because it was intended to accomplish a special purpose, and that it would have to be a very plain violation of the Constitution to permit the City to repudiate its contract when it can not restore the company to the position it occupied before the agreement was made.                                    pp. 54, 57

Under the decision in 111 Maryland, the City can not tax the easements and collect the graduated park tax; there can be no difficulty about apportioning the tax, and there is no occasion for any confusion by reason of the tax on the easements ending and the park tax beginning before the end of the year.      p. 58

*Decided April 16th, 1915.*

Appeal from the Baltimore City Court. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The following is Chapter 566 of the Acts of 1906, which the Court directed to be printed in full, with the report of the case:

AN ACT to modify, with the consent of the Board of Estimates, for a period of years, the Park Tax that may in certain events become payable by the United Railways and Electric Company of Baltimore upon the gross receipts that may in certain events be derived by it from the use by it for its corporate purposes of certain roads proposed to be acquired and opened as public highways by the Mayor and City Council of Baltimore in the Annex; to authorize the Board of Estimates, in its discretion, to grant, in certain events, to said company the franchise or right of using said roads for its corporate purpose in perpetuity, and to modify in certain respects, in relation to said roads, the present powers of the Board of Estimates in the matter of fixing the compensation for franchises or rights in public property.

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That in the event that the existing street railway, franchises, easements, interests or rights of the United Railways and Electric Company of Baltimore in any of the roads within the limits of that part of Baltimore City known as the annex, as to which roads the said street railway company is not legally liable to the payment of the park tax hereinafter mentioned, or in any part or parts of said roads, or any of them, shall in any manner be acquired by the Mayor and City Council of Baltimore, pursuant to the authority conferred upon by Chapter 274 of the Acts of the General Assembly of Maryland for the year 1904, and ordinance of the Mayor and City Council of Baltimore, No. 216, approved March 11, 1905, or by any other laws or ordinances relating to the powers and duties of the Commissioners for Opening Streets under said Acts, and application or applications shall afterwards be made by the United Railways and Electric Company of Baltimore to the Mayor and City Council of Baltimore, subject to the provisions of Sections 7-12, both inclusive, and Section

37 of Article 4, entitled "City of Baltimore," of the Code of Public Local Laws of Maryland, for the franchise or right to use the beds of said roads, or any of them, for its railway lines, and the ordinance or ordinances making said application or applications, shall be duly passed by the Mayor and City Council of Baltimore, then with the consent of the board of estimates, expressed in said ordinance or ordinances, the park tax of nine per centum upon the gross receipts of passenger street railway companies in the City of Baltimore, now prescribed and regulated by Sections 797-800, both inclusive, of Article 4, entitled "City of Baltimore," of the Code of Public Local Laws of Maryland, shall, as to the bed or beds of the public highway or highways, covered by said ordinance, or ordinances, and for the period of eleven years, accounting from the date or respective dates of passage of said ordinance or ordinances, be payable and paid by the said United Railways and Electric Company of Baltimore, its successors and assigns, to the Mayor and City Council of Baltimore, as follows: For the first three years of said period of eleven years the gross receipts of said company from its lines on the bed or beds of the public highway or highways covered by said ordinance or ordinances shall be exempt from said park tax as at present; for the fourth year of said period of eleven years they shall be subject to said park tax at the rate of one per centum; for the fifth year to said park tax at the rate of two per centum; for the sixth year to said park tax at the rate of three per centum; for the seventh year to said park tax at the rate of four per centum; for the eighth year to said park tax at the rate of five per centum; for the ninth year to said park tax at the rate of six per centum; for the tenth year to said park tax at the rate of seven per centum; for the eleventh year to said park tax at the rate of eight per centum, and thereafter to said park tax at the general rate of nine per centum each year, as now pre-

scribed and regulated as aforesaid by said Section 797-800, both inclusive, of Article 4, entitled "City of Baltimore," of the Code of Public Local Laws of Maryland, or at such other rate or rates as may be hereafter prescribed by law; provided, however, that the franchise or right so granted to the United Railway and Electric Company of Baltimore, its successors and assigns, in said roads, or any of them, may, in the discretion of the Board of Estimates, so far as the same may be now perpetual, be in perpetuity; provided, however, that nothing herein shall be construed to make perpetual, or to grant in perpetuity, any franchise or right whatsoever (as a franchise or right in perpetuity) which heretofore has not been owned or enjoyed by the said United Railways and Electric Company of Baltimore as and for a right perpetual, or franchise or right in perpetuity.

SEC. 2.   *And be it further enacted,* That in view of the fact that the beds or parts of the beds of said roads, or some of them, are now occupied by the United Railways and Electric Company of Baltimore, and its rights in such roadbeds, or parts of roadbeds, are proposed to be acquired by the Mayor and City Council of Baltimore for the sole purpose of securing for the public the unconditional use thereof as public highways, the Board of Estimates is hereby authorized, in its discretion, after the acquisition of said roadbeds, or parts of roadbeds, by the Mayor and City Council of Baltimore, should the United Railways and Electric Company of Baltimore, its successors and assigns, apply for the franchise or right of using any of said roadbeds, or parts of roadbeds, for its railway lines, to fix the compensation, or compensations, to be paid therefor, without reference to any other application or applications for the same franchises or rights by any other person or corporation, and free from the obligation cast upon it by Section 37 of Article 4, entitled "City of Baltimore," of the Code of Public Local Laws of Maryland, to fix the compensa-

tion to the Mayor and City Council of Baltimore in such cases at the largest amount that it may be able by advertisement or otherwise to obtain for the franchise or right; provided, however, that said compensation or compensations shall in no case be fixed by said Board of Estimates at a lower sum or sums than the sum or sums which the Mayor and City Council of Baltimore shall have paid, or become obliged to pay unto said company, whether as the result of condemnation proceedings or otherwise, under the provisions of Chapter 274 of the Act of the General Assembly of Maryland for the year 1904, for the purpose of acquiring the respective street railway franchises, easements, interests or rights now or hereafter possessed or enjoyed by said company in said respective roadbeds, or parts of roadbeds, as to which said application or applications for new franchises or rights shall or may be made by said company, as aforesaid.

SEC. 3. *And be it further enacted,* That this Act shall take effect from the date of its passage.

Approved April 5, 1906.


The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.


*S. S. Field, City Solicitor,* and *Benj. H. McKindless, Asst. City Solicitor,* for the appellant.


*Joseph C. France* and *Sylvan Hayes Lauchheimer* (with whom was *Albert R. Stuart* on the brief), for the appellee.


BOYD, C. J., delivered the opinion of the Court.

This is an appeal from four orders of the Baltmore City Court setting aside assessments on certain easements of the appellee on streets in the Annex to Baltimore City—being

for the years 1911 and 1912 on York road and Thirty-first street; for the year 1913 on York road, Thirty-first and Seventh streets, and for the year 1914 on York road, Thirty-first street, Seventh street and Harford road. Appeals were taken by the company to the Baltimore City Court from assessments made by the Appeal Tax Court of Baltimore City in the four cases, which were by agreement consolidated. At the hearing the railway company presented sixty and the City forty-three prayers, applying to the several assessments. The Court granted the company's tenth prayer applying to the assessment for the year 1911, its tenth to the assessment for 1912, its fourteenth to that of the year 1913 and its eighteenth to that of the year 1914, and rejected all of the others.

The appellant (the City) states in its brief that there are three questions which are brought before this Court:

(1) The constitutionality of Chapter 566 of the Acts of 1906; (2) Whether an assessment for purposes of taxation can under existing laws, be apportioned during the term of the fiscal year; (3) The proper construction of Chapter 566 of the Act of 1906, if a valid exercise of legislative power.

The company contended that, by virtue of the Act of 1906 and the decision of this Court in *United Railways and Electric Co.* v. *Mayor and City Council of Baltimore,* 111 Md. 264, as soon as the Park Tax attaches there can be no tax on the easement. We will first consider the question of the constitutionality of the Act of 1906. The grounds relied on by the City are: (*a*) Because it is a special law in favor of the United Railways and Electric Company, in reference to a subject for which provision has been made by the existing general law. (*b*) Because it violates Article 15 of the Declaration of Rights, in that it exempts the company from contributing its "proportion of public taxes," according to its "actual worth in real and personal property."

As the Act of 1906 is quite long, we will not quote it in full in this opinion, but will request the reporter to publish it in his report of the case. In considering the constitution-

ality of that Act it is proper that we keep in mind the conditions existing at the time of its passage. It had been decided in 1896 in the *Park Tax Case,* 84 Md. 1, that the "gross receipt or park tax" could not be imposed on a suburban railway upon a turnpike road within the limits of the City, as extended under the Act of 1888, Chapter 98—being what is commonly spoken of as the Annex—so long as the company owned that road and it was not a public street. In *Baltimore City* v. *United Rys. Co.,* 107 Md. 250, decided in 1908, we held that the Railway Company was liable for the park tax upon its gross receipts from all its lines operated on public streets within the present City limits, including the roads that were formerly county roads, but was not liable to the tax upon its receipts from lines constructed on turnpikes and other rights of way acquired by private grant, which had not been made public streets. We pointed out that in the *Park Tax Case* in 84 Md., in exonerating the railway in that case, the decision was based on the fact that it was not using any street of the City. So at least since 1896, when the case in 84 Md. was decided, a railway company was known not to be liable for the park tax upon its receipts from lines on turnpikes and other private rights of way, which had not become public streets. Then in *United Rys. Co.* v. *Baltimore City,* 111 Md. 264, we held that no other tax upon the assessments or franchises of the railway companies, or their right to occupy the streets in Baltimore City, could be assessed against them without express legislative authority, but that when a street railway company in said City is located in part on turnpike roads and private rights of way, upon the receipts from which such tax is not paid, the easements therein are liable to taxation.

It was shown in the evidence in this record "that on January 1, 1906, there was not, and has never been since, any electric street railway company operating or owning tracks in the Annex of Baltimore City on any private rights of way or turnpikes other than the United Railways and Electric Company of Baltimore City."

Section 796 of Article 4 of Code of Public Local Laws (Charter 123 of 1898) provided that, "Each of the several passenger street railway companies in the City of Baltimore shall charge five cents, and no more, for the conveyance of each passenger over twelve years of age, and three cents, and no more, for each child between the ages of four and twelve years, from any point on any line of its railway to any other point on such line within the City of Baltimore, with a charge of three cents, and no more, for transfers;" and Section 797 is, "The said several passenger street railway companies shall pay to the Mayor and City Council of Baltimore a tax upon their gross receipts of nine per cent., in quarterly instalments, on the first day of January, April, July and October, in each year." Those sections are the same as those of the Act of 1882, Chapter 229, which became sections 768 and 769 of Article 4 of Code of 1888, except that in the latter the word "horse" was used instead of "street"—reading "several passenger horse railway companies."

There is no significance in the change made by the new charter, as the latter was simply adapted to the new conditions, when horse railways were but little, if any, used, and adopted a term which covered all kinds of passenger street railway companies. The Act of 1900, Chapter 313, however, is significant. That Act in terms repealed and re-enacted section 796 of Article 4 and read as follows: "796. The United Railways and Electric Company of Baltimore, its successors and assigns, shall charge five cents, and no more, as a fare for the conveyance of each passenger over twelve years of age, and three cents, and no more, for each child between the ages of four and twelve years, from any point on any of its lines to any other point on such lines within the City of Baltimore," and then, after providing for free transfers, added, "provided, that nothing in this Act shall be construed to affect any of the interests of the Mayor and City Council of Baltimore in the said United Railways and Electric Company of Baltimore, or any of the railways consolidated under the corporate name."

One contention of the City, in reference to the Act of 1906, is that it is unconstitutional because it limits the privileges, rights, etc., to the United Railways Company instead of making it applicable to all railway companies, and yet we have above a statute which undertook to repeal and re-enact the provisions of the City Charter in reference to the rates to be charged, which on its face only applied to that company and to its constituent companies, and that too was the Act which required free transfers, instead of charging three cents as theretofore. It did not purport to be an amendment to the charter of the railway company, but to the City Charter, and after the amendment of section 796, section 797, imposing the Park Tax, referred to the United Railways Company "or any of the railways consolidated under the corporate name," when it provided that, "The *said* several passenger street railway companies," etc., as there were then no other passenger street railway companies mentioned in that connection. That was the provision in the Charter when the Act of 1906 was passed, and apparently the appellee was regarded by the Legislature, and presumably by the City, as at that time including all of the passenger railway companies then operating in the City. Without following that up, we assume that some provision was made as to the other two companies which the record shows now have some lines in the City, either in their charters or in some other Act or Acts, but however that may be, it cannot consistently be said that the Act of 1906 is invalid because it only names the United Railways Company, but that the Act of 1900, which also only names that company, is valid, especially as the provision for the Park Tax (section 797) is immediately connected with section 796, as shown above, and indeed those two sections were originally passed together in the Act of 1882. But, as we have seen, in point of fact no other railway company did operate or own tracks in the Annex in 1906, or has operated or owned any there since that time, and that is the only portion of the City covered by the Act of 1906. Manifestly the appellee constituted a class of itself,

and similar conditions did not exist with any other company within the territory to which this statute was applicable. In addition to that if any new company proposed to come into the Annex such provisions as those included in what are now sections 273 and 274 of Article 23 of the Code of 1912 (sections 255 and 256 of Code of 1904) afforded the City ample protection, and it could have imposed conditions similar to those in the Act of 1906, if necessary or thought to be desirable.

We have then these conditions, which were intended to be covered by this Act. The United Railways Company was in fact the only company which owned or operated tracks in the Annex of Baltimore City on any private rights of way or turnpikes. Some, if not all, of them, had been acquired by its constituent companies, but of course the Act of 1906 applied to all of them. That company was not in 1906 legally liable to pay any park tax on the roads in question—indeed the Act in terms only applied to roads for which "the said street railway company is not legally liable to the payment of the Park Tax hereinafter mentioned, or in any part or parts of said roads, or any of them." The City proposed to acquire some parts of those roads in the Annex, and doubtless after it did so the railway company would still want to have its tracks on them to accommodate the public—indeed it might have been assumed that the public would have demanded that the company still have its lines on at least some of those roads.

The Act of 1904, Chapter 274, had authorized the City to issue stock (if an ordinance to that end be approved by the voters of the City), for the purpose of providing the cost and expenses of condemning, opening, grading, paving and curbing the streets, etc., in the Annex portion of the City. It was doubtless the desire, as well as the plain duty, of the authorities to acquire the streets referred to in the Act of 1906 at as low figures as could justly be done. In order to do so some inducement had to be offered. The City had the right, under section 5 of Act of 1904, "to acquire by gift,

purchase, lease, whatever the duration of the lease, or by other methods of acquisition, or by condemnation, any private property whatsoever, including streets, avenues, lanes and alleys, rights or interests, franchises, privileges, or easements that may be required," etc.   The Act of 1906 expressly referred to the Act of 1904.   While if necessary the City could condemn, it could only do so on failure to agree with the owner, and it was of the utmost importance to the City to have special authority to deal with the railway company in a way different from what it could deal under its general charter provisions.   It was an exceptional—call it special if preferred—case that was being provided for.   The railway company already had what it wanted in those rights of way in the Annex—it owned them and apparently had franchises or rights in perpetuity in some of them, as the Act indicates.   The City could not have taken away the rights of the railway company in the turnpikes, streets or rights of way without paying just compensation for them.   By agreement between the City and the railway company an assessment of over $35,000 per mile was imposed on the easements of the company in 1910—there being an assessment of $500,-000 on the fourteen miles of private rights of way, not subject to the Park Tax.   If simple justice was to be done the railway company, the City could not acquire the rights of that company without paying large sums of money for them. if they were to be acquired in the ordinary way, as provided by the Charter.   The City wanted to acquire those rights in the road beds "for the sole purpose of securing for the public the unconditional use thereof as public highways," to use the language of the Act of 1906.   If then the City could acquire all it wanted, and thereby also get the right to eventually impose the Park Tax on the gross receipts of the company for such parts of its roads, without paying more than nominal compensation, why should it not be permitted to do so by a special Act?   It could not make such an arrangement under the General Laws, as under them it would have been compelled to pay the value of the property and rights taken,

and could not have provided for franchises in perpetuity
or have granted them without inviting others to bid for such
franchises. It was not a case of this appellee getting special
advantages without paying for them, but it was the City
that was profiting by the arrangement. When one of the
appellee's roads would be acquired by the City under the Act
the appellee was in no better shape than it was before—
indeed it was not in as good a position. Its ownership of
the road was gone, it was liable to the control the City had
over its public streets, and in three years it commenced to
pay the graduated Park Tax, none of which, under existing
laws, could it previously have been required to pay. Dur-
ing those three years of exemption from the Park Tax it was
liable for taxation on its easements, and it can not be prop-
erly said it was exempted from taxation. It would have been
manifestly unfair to require the railway company to turn
over all of its rights in a road to the City upon the City
simply giving it in return such franchises as it already had·
—in other words, give its property and rights to the City for
nothing. If the City had paid the railway company the
value of its franchises, rights and property, the interest on
a sum which would have been a just compensation might for
some years have amounted to more than nine per cent on the
gross receipts from such part of the road in the Annex—
would likely have been at least more than the difference
between the graduated tax and the nine per cent. Certain
it is that if there was to be any show of fair dealing, and
the City had condemned the franchises and rights in per-
petuity owned by the railway company, and could not have
given it in return a franchise longer than that provided by
the General Law, it would have been required to pay hand-
somely for taking away the franchise in perpetuity in addi-
tion to its rights of way. The City had no power under its
Charter to have a graduated Park Tax, because it was sim-
ply authorized to impose the tax of nine per cent on the gross
receipts from public streets. It was therefore necessary to
have some legislation on the subject, and it is manifest that

such legislation was to the great advantage of the City.   Of course, the City could have condemned the company's rights without the Act of 1906 being passed, but as we have already shown, it would undoubtedly have been required to pay a large sum of money, if it had done so, especially if it had condemned any perpetual franchises the company had.

One of the most important reasons for the provision in the Constitution against special legislation is to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others.   But if there was in fact only one railway company in the Annex would not that objection be equally potent, whether that one company was alone named or the Act spoke of all the railway companies in the Annex, or used some other general expression ?   Then of course the object of the provision is to prevent discrimination against others, but how was it possible for any other company to be injured or discriminated against by this Statute ?   The property wanted by the City belonged to the appellee, and no one can carefully read this statute without being convinced that it was passed in the interest of the City, and not for the benefit of the railway company.   Courts should not be too ready to strike down such legislation on the theory that the same thing could have been worked out under existing General Laws.   It is said in 6 *R. C. L.* 417 (section 413) : "In cases of State constitutional prohibition against the passage of special laws where a general law may be made applicable, it is a rule that the question of applicability is one for the Legislature to determine, and that such a statute will not be declared unconstitutional, except where it clearly appears that the Legislature was mistaken in its belief that a General Law could not be made applicable." Again on page 419 of that volume it is said: "An important test in determining whether legislation is special or general is to consider not the form merely, but the substance." That statement is very applicable to a statute like this, where in form it has named only one company, but in fact that one covers all railway companies within the territory affected,

and the apparent advantages given it are really disadvant-
ages.

So far as the franchise is concerned, the Act is equally
unobjectionable.   It only provided that it might, in the dis-
cretion of the Board of Estimates, *"so far as the same may
be now perpetual,* be in perpetuity," and it emphasized that
by adding: "Provided, however, that nothing herein shall be
construed to make perpetual, or to grant in perpetuity, any
franchise or right whatsoever (as a franchise or right in
perpetuity) which heretofore has not been owned or enjoyed
by the said United Railways and Electric Company of Balti-
more as and for a right perpetual, or franchise or right in
perpetuity."   There again the City was directly interested
in such a provision in order to have the compensation for the
railway company placed as low as possible, but at any rate
it can not be said that it was an unreasonable or unjust pro-
vision to make, for it is well known that such franchises in
perpetuity are very valuable, and when a company acquires
them by purchase, or other lawful means, they can not law-
fully or honestly be taken away from it without paying their
full value for them.   The Act was only special in that the
railway company happened to be the sole owner of the roads
and rights in the Annex which the City desired to acquire,
and provisions were wisely made by which the City could get
all it wanted at a minimum price, which would have been
impossible under the general law.

Then as to granting the franchises without reference to
any other application or applications for the same by any
other person or corporation, we have the same reply to the
objection that that is special legislation.   The company al-
ready had those particular franchises, and it would have been
a monstrous injustice and mockery to have taken them away,
and then say the company can get them back, provided no one
pays more than it would for them—especially as the Act said
"provided, however, that said compensation or compensations
shall in no case be fixed by said Board of Estimates at a

lower sum or sums than the sum or sums which the Mayor and City Council of Baltimore shall have paid, or become obliged to pay unto said company," etc.

There is a wide difference between a special Act, within the meaning of the Constitution, and an Act for special purposes. There was no General Law by which the City could condemn the roads, etc., of the appellee in the Annex, and not pay for their full value, including the franchises and all other rights. It could not under any General Law have made such arrangements as it did make. The record shows that the City paid one dollar in each of the condemnation proceedings for the York road, Thirty-first street, and Seventh street, and while apparently it paid more for the 2 1/3 miles of the Harford road, it was a small amount for such a distance. The City was therefore enabled by the arrangement authorized by the Act of 1906 to acquire the rights of the railway company at a nominal cost, and to place the company in a position by which it would be required to soon pay the Park Tax. It must not be forgotten that when the Act was passed the assessment of the easements of such companies, separate and apart from their other properties, had not yet been satisfactorily worked out, and as late as 1909 this Court decided, in 111 Md., that the method adopted in reference to the taxable value of the easements of this company was not the proper one. We are of the opinion that this Act is not in conflict with section 33 of Article 3 of the Constitution, as there was no general law which covered the peculiar circumstances of the case, and the appellee constituted a class of itself.

Over and over again has the Legislature granted special powers to corporations which were incorporated under the General Laws and in many such cases no question was or could have been properly raised as to the validity of the legislation. As municipal corporations can only be chartered by special Acts of the Legislature, there is much more reason for sustaining such legislation as is now before us than that affecting private corporations, and as we have already said

this Act was unquestionably primarily intended for the bene-
fit of the City. If this Act had simply authorized the City to
enter into a contract with the railway company on such terms
as it did make with it there would have been no reason to
attack the Act on this constitutional ground, for surely the
Legislature had that right, and that is the effect of the Act.
Some of the cases in this State, while not conclusive, or
wholly in point, go far to sustain the conclusion we have
reached. In *Pumphrey* v. *Baltimore,* 47 Md. 145, the Act
of 1876 (Ch. 220) then under consideration required the City
to acquire the bridge in controversy. It was objected to as ob-
noxious to section 33 of Article 3 of the Constitution, but
the Court said: "In the public local laws relating to Balti-
more City, no provision is made for the acquisition of the
bridge in question, and the ascertainment of the amount to
be paid to the owners in the manner contemplated and di-
rected by the Acts, etc." In *Hodges* v. *Baltimore Pass. R'y.
Co.,* 58 Md. 603, the Act gave the company certain privileges
not given by the general laws. The Court said in reference
to the objection that it was contrary to this provision of the
Constitution: "This assumes that provision has been made
by a general existing law conferring on the defendant cor-
poration the privileges claimed under the Act of 1882," and
then went on to show it had not been. In *Revell* v. *Mayor,
etc., of Annapolis,* 81 Md. 1, the Act provided for the erec-
tion of a public school building in Annapolis and authorized
and directed the School Commissioners to borrow money on
·bonds to be endorsed by the County Commissioners and di-
rected the City of Annapolis to issue bonds to help to pay
for it. The Court said it was true the general law provided
that the School Commissioners should have control and super-
vision over the public schools with power to build, repair and
furnish school houses, but as it did not authorize the Com-
missioners to borrow money upon bonds to be endorsed by
the County Commissioners for such purpose, nor for the
apportionment of the cost between the county and the city,

it could only be done by special act. Other cases might be cited by way of illustration but we will not do so.

The second ground of the appellant for contending it is unconstitutional is equally untenable, as we have already intimated. The Act did not exempt the appellee from all taxes, and the exemption that was given it was not an unreasonable one, especially when we remember the peculiar provisions for taxation of property in the Annex, and the appellee occupied a position peculiar to itself. It only exempted it from the Park Tax for the three years and in the meantime the easements were taxable. The record does not show on how many miles the other two roads mentioned pay the Park Tax, but as they are really interurban roads they can not have many miles in the City on which to pay. The great bulk of the whole Park Tax is paid by the appellee, and as the Legislature can fix the amount of that tax, there can be no valid reason why it could not authorize a graduated tax under such peculiar conditions as exist in this case.

The railway company had when this Act was passed about fourteen miles of private rights of way in the City. After the decision of this Court in 1909, in 111 Md., holding that the fourteen miles of rights of way were subject to the easement tax, but also holding that the method adopted by the City in making the assessment was not the proper one to ascertain the taxable value of such easements, it was agreed between the general counsel of the railway company and the then City Solicitor that "The non-park-tax paying easements shall be assessed, from and including the year 1907, at five hundred thousand dollars, until the amount of the assessment is reduced by credits as follows, namely: Said assessment will be apportioned, according to track mileage, among the fourteen plus miles of turnpikes and private rights of way; and as the same severally became subject *to graded Park Tax,* the five hundred thousand dollars assessment shall be credited with such a sum as bears the same ratio to five hundred thousand dollars as the track mileage bears to the

fourteen plus miles." On the 19th of December, 1910, an order was passed by the Baltimore City Court providing that in accordance with the agreement reached between the respective parties an assessment of $500,000 be imposed for the year 1908 upon the easements of the United Railways and Electric Company of Baltimore, in and on the turnpike roads, private streets and private rights of way located and lying within the limits of the City of Baltimore—said easements aggregating approximately fourteen miles in length. The settlement was made on the express terms that the assessment for the easements was to be reduced as the roads became subject to the graded Park Tax, and it would have to be a very plain violation of the constitutional provision to permit the City to repudiate its contract, when it can not restore the railway company to the position it occupied before the agreement was made. By the arrangement it may be that the City saved enough to more than pay the difference between the graded tax and the nine per cent. The company also paid on an assessment of its property at the rate of $12,000 per mile for its tracks, on $164,500 for its bridges, viaducts and elevated structures, in addition to the Park Tax and what was paid on its capital stock.

It seems clear that under the decision in 111 Md. the City can not tax the easements and collect the graduated Park Tax. The Act itself settles the question. It says. "then with the consent of the Board of Estimates, expressed in said ordinance or ordinances, the Park Tax of nine per centum upon the gross receipts of passenger street railway companies in the City of Baltimore, now prescribed and regulated by sections 797-800, both inclusive, of Article 4, entitled 'City of Baltimore,' of the Code of Public Local Laws of Maryland, *shall,* as the bed or beds of the public highway or highways, covered by said ordinance, or ordinances, and for the period of eleven years, accounting from the date or respective dates of passage of said ordinance or ordinances, *be payable and paid* by the said United Railways and Electric Company of Baltimore, its successors and assigns, to

the Mayor and City City Council of Baltimore *as follows.*" It then exempts such roads from the Park Tax for the first three years "as at present"—the expression quoted referring to the fact as settled in 111 Md. that such private roads were exempt, and, "for the fourth year of said period of eleven years they shall be subject to said Park Tax at the rate of one per centum," and so on, to the eleventh year, when it was eight per centum, "and thereafter to said Park Tax at the general rate of nine per centum each year," etc. It seems to us that that clearly shows that the payment of the graduated tax was intended to have the same effect as the payment of the nine per cent tax, and would entitle the company to a credit on the assessment of easements from the time the graded Park Tax took effect.

There can be no difficulty about apportioning the tax. The Park Tax is payable on the first day of January, April, July and October, in each year. If the graduated tax excludes taxation of easements, as we hold it does *pro tanto,* then the two can not run together. The City authorities know, or ought to know, whether there will become due any such Park Tax during the year, and there is no occasion for any confusion, by reason of the tax on the easements ending and the Park Tax beginning before the end of the year.

As we do not understand that any question was raised as to the forms of the prayers, and we agree with the lower Court in its conclusions, we will affirm the orders appealed from, without discussing the prayers separately.

*Orders affirmed, the appellant to pay the costs above and below.*