491 A.2d 1218

**Thomas MILLER**

v.

**MALONEY CONCRETE COMPANY.**

**No. 845, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

May 9, 1985.

**40**

Martin J. Hutt, Bethesda (Harry W. Lerch and Lerch, Early, Roseman & Frankel, Bethesda, Chartered on the brief), for appellant.

Stephen Swartz, Silver Springs (Charles G. Dalrymple and Linowes and Blocher, Silver Springs, on the brief), for appellee.

Argued before GILBERT, C.J., and WILNER and ROBERT M. BELL, JJ.

WILNER, Judge.

Among the powers granted to chartered counties in Maryland by the "Express Powers Act" (Md.Code Ann. art. 25A, § 5) is the power to "prevent, abate and remove nuisances." Sec. 5(J). The Act does not specify how that power may be implemented.

One of the ways that Montgomery County has chosen to implement it is by including in its zoning law a provision that "[a]ny use which is found by the [county board of appeals] to be a public nuisance, by reason of the emission

of dust, fumes, gas, smoke, odor, noise, vibration or other disturbance, is expressly prohibited." Montgomery County Code, § 59–A–5.7. The validity of that provision, as applied in this case, is the subject of this appeal.

For some 45 years, Maloney Concrete Company, appellee, has operated a concrete batching plant on the southeast corner of Bethesda Avenue and Arlington Road. At least since 1962, the operation was conducted on two contiguous parcels of land, each comprising approximately 15,000 square feet. One of the parcels was owned by Thomas Miller, appellant, and was leased to Maloney.

When Maloney began its operation, and continuing into the mid-1970's, the neighborhood was industrial and the land was zoned industrial. Maloney's use of both parcels was a permitted, lawful one. Over the years, however, as the Bethesda area developed, the character of the neighborhood began to change. In 1976, the Maryland-National Capital Park and Planning Commission (Park and Planning Commission) and the Montgomery County Council, sitting as a District Council under the Park and Planning Commission law (current Md.Code Ann. art. 28, § 8–101), approved and adopted the "Bethesda Sector Plan," which recommended that the area be upgraded from industrial to retail commercial use. In accordance with that recommendation, the District Council, as part of its 1977 comprehensive rezoning, rezoned the area from industrial to general commercial. A concrete batching plant is not a permitted use in a general commercial zone, but, because it was lawfully in existence at the time of the rezoning, the Maloney plant became a lawful nonconforming use under Montgomery County Code, § 59G–4.1.

Mr. Miller owned a number of parcels along Bethesda Avenue and Arlington Road, other than that leased to Maloney. Consistent with the changing character of the neighborhood, he decided to develop his properties for retail commercial purposes. Three clusters were planned and built—Bethesda Row, located immediately adjacent to the

Maloney Plant, Bethesda Avenue Row East, located across Bethesda Avenue somewhat north of the plant, and Bethesda Avenue Row West, located catercorner from the plant, on the northwest corner of the intersection. Bethesda Avenue Rows East and West were quickly and successfully leased—within two months after completion—at rentals ranging from $15 to $20 per square foot. The center immediately adjacent to the plant—Bethesda Avenue Row—took about two years to lease fully, the average rental there being about $14 per square foot.

Consistent with this development, Miller decided not to renew Maloney's lease when it expired in September, 1982. That decision necessarily required Maloney to consolidate its operation on the remaining half of its property. One result of the dislocation was the inability of Maloney to conduct its unloading operations—the delivery of dry cement from 20-ton hopper trucks—within the confines of the property itself. While the lease was in effect, the trucks parked and unloaded on the property within a fenced boundary; after September, 1982, the trucks parked along Arlington Road and pumped the cement powder into the plant through pneumatic tubes that extended from the plant to the street.

On November 12, 1982—exactly two months after termination of the Maloney lease—Mr. Miller, invoking § 59–A–5.7 of the county code, filed a petition with the county board of appeals, claiming that Maloney's operation produced dust, dirt, noise, vibration, and smoke so as to affect adversely the public health, safety, and general welfare, as well as the peaceful use, enjoyment, and value of surrounding properties. The same day, the Edgemoor Citizens Association, Inc. filed a similar petition.

The board conducted a hearing on June 16, 1983, at which ten people testified—Miller, his leasing agent, four of his tenants, two nearby residents, a nearby businesswoman, and an environmental engineer. What emerged from the lay witnesses were complaints about (1) dust emanating

from the plant, (2) noise, traffic congestion, and safety hazards from the trucks, and (3) water and mud on the ramp leading from the Maloney property to the street. As noted, Miller had successfully leased his three developments, although it took a while to lease fully the project nearest the plant. None of the businesspeople indicated any loss of business by reason of the plant or the inability to conduct their respective businesses. One of the resident-witnesses complained that dust covered her porch, car, and bushes, but that was apparently a condition that long predated Maloney's loss of the leased parcel. The other resident-witness, who opposed the petitions, indicated that "apparently no one had any problem from dust, or noise, or anything, until these shops were built there, and Mr. Miller started to file complaints...."

The testimony of the engineer—Mr. Kamber—focused on noise, water quality, and air quality. The county has a noise control law, codified as ch. 31B of the county code. The law specifies certain maximum noise levels permitted from commercial property which, Kamber said, are exceeded by Maloney's operation. Mr. Kamber identified two sources of the noise—the trucks themselves and the plant. From the trucks, there came the sound of the engines, a whirring sound while the trucks were dumping, and the banging of tailgates. From the plant came the sound of the aggregate being dumped into bins. Those sounds, said Mr. Kamber "are the sounds of industrial progress" that are "characteristic of what you would expect if you were in an industrial area," but "are not particularly pleasant sounds in and around a residential area, or a commercial area."

Mr. Kamber made no independent study of the effect of the Maloney operation on water quality, but referred to county studies and records. Some of the dust, he said, ends up in the storm drainage system and is ultimately discharged into Willeck Branch. Those are not desirable substances to have discharged into the streams, he stated, but how much that runoff contributes to the poor water quality in Willeck Branch "I don't know, and I don't think even the

county, with their monitoring data, really knows...."
Some of the problem, he agreed, had been eliminated when
Maloney stopped washing its trucks at the plant site; some
of the pollution in Willeck Branch was attributable to the
construction of the Metro system and not to the Maloney
operation.

As to air quality, Kamber cited problems with dust and
exhaust fumes emanating from the trucks. The dust, he
said, "one can anticipate ... at a batching plant; that's just
characteristic of those." The emissions from the trucks
could be alleviated if Maloney had more room at the site.

Finally, the board admitted into evidence a letter from the
chairman of the Park and Planning Commission noting that
(1) as part of the 1977 comprehensive rezoning, it was
recognized that the Maloney property would be "in a legal
nonconforming status" and (2) Maloney had purchased land
elsewhere for the purpose of relocating the plant, but the
county council declined to approve the necessary zoning for
that site and thus "thwarted the intended relocation...."
The letter concluded:

"The Planning Board continues to believe that it is
highly desirable to have such a business located in the
lower county. While we agree that it must comply with
relevant noise control and air pollution standards, it must
be remembered that the surrounding businesses chose
their locations long after the concrete plant was in opera-
tion and governmental action has made it difficult to
relocate the plant.

More recently, it has been brought to my attention that
the loading of trucks has been forced onto Arlington
Road by virtue of the fact that a portion of the adjoining
lot formerly leased for that purpose is no longer avail-
able, which has constricted the operation."

Upon this evidence, the board concluded that the batching
plant operation constitutes a public nuisance, but that the
"nuisance aspects ... may be removed by Maloney in the
following manner:

1. The plant shall be operated in such a fashion that noise emitted by its operation shall not exceed 62 dBA at any property line of the Maloney Concrete property.
2. The plant shall be operated in such a way that water and concrete residue shall not be discharged onto the property abutting the south property line, and concrete residue shall not be discharged into the public sewer system.
3. The plant shall be operated in such a way that smoke, soot and dust will not be discharged into the air in quantities sufficient to leave a visible film on cars parked nearby.
4. Operation of the batching plant shall be confined to property owned or leased by Maloney Concrete Company, that is to say, public property shall not be utilized on a regular basis for unloading of supply trucks from Arlington Road."

The board made no finding as to whether these conditions could, in fact, be satisfied. Instead, it concluded that "Should Maloney fail, within thirty (30) days of the date of this Opinion, to conform its operations to the four mandates of the Board as above set forth (and, thereby, to eliminate the nuisance aspects of the batching plant), the Board will refer this Opinion to the County Attorney for initiation of appropriate enforcement proceedings. Conformity to the mandates shall be certified to the Board by Maloney Concrete Company and verified by the Montgomery County Department of Environmental Protection."

Maloney appealed to the Circuit Court for Montgomery County which, on June 19, 1984, reversed the board. The court gave its reasons in an oral opinion. It found that (1) the board failed to make findings of fact, as required by the county's administrative procedure act (Montgomery County Code, 1981 Cum.Supp., § 2A–10) and by basic due process of law, and that, in the absence of such findings, the court could not determine what standards had been used in find-

ing the operation to be a nuisance or how compliance with the board's conditions would be measured, (2) § 59–A–5.7 was itself unconstitutionally vague, as it contained no standards for defining or determining the existence of a nuisance, (3) if the common law of nuisance is applied, there was insufficient evidence to support the board's finding of public nuisance, (4) the board impermissibly intruded upon the jurisdiction of the county and State departments of transportation and, to a limited extent, upon the jurisdiction of the county department of environmental protection, (5) the board has no authority to enforce the abatement of a nuisance, and (6) under all the circumstances, the board's action violated Maloney's right to due process of law.

Miller is now the aggrieved party. In this appeal, he takes issue with each of the court's findings, arguing that:

"I. The Lower Court Erred in Considering the Constitutionality of Section 59–A–5.7

II. Section 59–A–5.7 of the Montgomery County Code is Not Unconstitutional

III. The Lower Court Erred When It Found that the Decision of the Montgomery County Board of Appeals was not Supported by Substantial Evidence and Therefore was not at the Very Least Fairly Debatable

IV. The Board's Decision did not Violate Section 2A–10(a) of the Montgomery County Code

V. The Montgomery County Board of Appeals is not Precluded by Other Provisions of the Montgomery County Code from Considering Traffic Related Issues in Connection with Section 59–A–5.7

VI. The Board of Appeals in Its Opinion was not Attempting to Delegate Itself Enforcement Powers

VII. The Board of Appeals Decision does not Constitute a Taking of Property Without Due Process or Just Compensation."

It is true, as Miller argues, that statutes are generally presumed to be constitutional, that they should not be

declared otherwise unless the repugnancy is clear, and that courts should avoid declaring a statute invalid if there is some less drastic way of deciding the case. That said, however, we find no fault with the decision of the circuit court. Section 59–A–5.7, both inherently and as applied in this case, clearly is invalid, and it would be a waste of time, effort, and money to duck that issue and permit any further proceedings to begin or continue under that ordinance. In light of that conclusion, it is unnecessary for us to consider whether the court's other reasons are valid.

To appreciate the Constitutional defect, one must first examine the statute in the light of other relevant provisions of law.

Section 59–A–5.7 reads, in its entirety:

"Any use which is found by the board to be a public nuisance, by reason of the emission of dust, fumes, gas, smoke, odor, noise, vibration or other disturbance, is expressly prohibited. No such finding shall be made by the board except after a hearing upon reasonable notice, and any person, the [Park and Planning Commission] or the district council may file a petition with the board for such hearing."

Section 59–A–5.7 is part of the county zoning law—ch. 59 of the county code. That is significant because of § 59–A–1.3(a), which provides that "[v]iolations of this chapter may be punishable as provided in section 2–120 of Article 66D of the Annotated Code of Maryland." That section, in turn, provides: [1]

"Every act or omission designated as a misdemeanor in this article, unless otherwise provided, shall be punishable

---

1. Art. 66D, until 1983, was the Park and Planning Commission law and the source of Montgomery County's authority to enact zoning ordinances. *Cf. Pr. George's Co. v. Md.-Nat'l Cap.*, 269 Md. 202, 306 A.2d 223, *cert. denied* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); *Northampton v. Pr. George's Co.*, 273 Md. 93, 327 A.2d 774 (1974). By 1983 Md.Laws, ch. 57, art. 66D was moved, without change, to art. 28 of the Md.Code. Thus, § 2–120 of art. 66D now appears as § 2–120 of art. 28.

before any District Court or in the circuit court of the county in which the offense is committed. It may be brought by warrant or indictment upon the oath or information of any member of the Commission or the employee thereof or any other person. Upon conviction thereof, the offender shall be subject to a fine not exceeding $500 or to 90 days imprisonment in the county jail, or both, in the discretion of the court. If the act or omission is of a continuing nature, or is persisted in, in violation of the provisions of this article, or of any regulation enacted or decision made under the powers granted in this article, each and every day during which the act or omission continues or is persisted in shall be deemed a separate misdemeanor."

Section 8–120(a) of art. 28 provides, in relevant part, that, in Montgomery County, "the use of land or premises in violation of any ... regulation enacted under this title or of any decision made under this title, is a misdemeanor.... The County Council of Montgomery County or the prosecuting official of Montgomery County may prosecute any violation."

█ Putting these various statutes together, it is apparent that § 59–A–5.7 is, by nature, a criminal statute. Although § 59–A–1.3(b) permits infractions to be punishable by "a civil fine" of up to $500 for each offense, as an alternative to criminal penalties, the fact remains that for each day that a person uses property in a manner that the board of appeals has declared to be a nuisance that person is subject to criminal prosecution, 90 days in jail, and a $500 fine.

█ Because § 59–A–5.7 carries criminal penalties and is therefore a criminal statute, it is subject to the Constitutional requirement that it be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Bowers v. State*, 283 Md. 115, 120, 389 A.2d 341 (1978); *In re Leroy T.*, 285 Md. 508, 403 A.2d 1226 (1979). As the Court noted in those

cases, this embodies really two requirements: (1) that the statute give fair notice of what is required or prohibited so that persons of ordinary intelligence and experience may be able to govern their conduct accordingly, and (2) that it "provide legally fixed standards and adequate guidelines" for those charged with administering and enforcing the law. *Bowers*, 283 Md. at 121, 389 A.2d 341; *Leroy T.*, 285 Md. at 512, 403 A.2d 1226. *See also Governor v. Exxon Corp.*, 279 Md. 410, 454, 372 A.2d 237, *aff'd* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

■ Our principal concern here is with the second of these requirements. A vague law, said the Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), "impermissibly delegates basic policy matters ... for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Thus, although a criminal statute is not void "merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials," it *is* void where it "is so broad as to be susceptible to irrational and selective patterns of enforcement...." *Bowers*, 283 Md. at 122, 389 A.2d 341.

The need for basic standards is particularly apparent when the subject of the statute is that elusive concept of nuisance. As Professors Prosser and Keeton have observed, "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'. It has meant all things to all people...." *Law of Torts*, 5th ed., p. 616. Indeed, in *Hart v. Wagner*, 184 Md. 40, 46, 40 A.2d 47 (1944), the Court, quoting and adopting 20 R.C.L., "Nuisance," p. 380, defined a nuisance in legal parlance as extending to "everything that endangers life or health, gives offense to the senses, violates the laws of decency or obstructs the reasonable and comfortable use of property."

In light of that expansive concept of the term, the Court has recognized the need for some definitional limitations

when criminal sanctions are involved. Thus, in *Tea Company v. Bel Air*, 172 Md. 536, 539–40, 192 A. 417 (1937), the Court held that "[n]uisances may only be declared so when they are so by common law, or by statutory definition." Proceeding further in *Adams v. Commissioners of Trappe*, 204 Md. 165, 173–74, 102 A.2d 830 (1954), the Court held:

"The State has the authority to abate nuisances in the exercise of its police power. Under this power, and subject to constitutional limitations, the Legislature of a State has the authority to declare what shall be deemed nuisances and to provide for their suppression. *Of course, the power of the Legislature cannot be made a cloak for confiscation. The Legislature has no power to declare arbitrarily and capriciously any or every act a nuisance.* Likewise, the Legislature may delegate to administrative officers the authority to determine whether certain things constitute public nuisances, with the power to abate them, or may declare that to be a nuisance which is detrimental to the health, morals, or welfare of the citizens." (Emphasis added.)

That delegation, the Court made clear, is also subject to the requirement that "any interference ... with the unrestricted use of private property must be reasonably necessary to the public welfare and consistent with the guarantees of the Constitution." *Id.*, 174, 102 A.2d 830. Obviously, if a legislative body is precluded from acting arbitrarily, so is an administrative body created by it. A legislature cannot delegate discretion that it does not itself possess.

What standards are there in § 59–A–5.7? What constraints are there on the exercise of the board's authority? There is neither a definition of "nuisance" nor a reference to the common law requirements. If the problem emanates from the emission of any one or more of the listed pollutants (including an "other disturbance"), a nuisance is essentially what the board says it is. Almost as with Humpty Dumpty, "it means just what I choose it to mean—neither more nor less." *Through the Looking Glass*, Lewis Carroll.

The problem is especially apparent when viewed in the context of the actual evidence in the case and other relevant statutes.

As noted earlier, the presumed authority for the enactment of § 59–A–5.7 is § 5(J) of art. 25A, empowering chartered counties to enact local laws to "prevent, abate and remove nuisances." *See also* § 5(S) providing catchall authority to pass ordinances "as may be deemed expedient in maintaining the peace, good government, health and welfare of the county" and § 5(T) permitting the enactment of ordinances "for the protection and promotion of public safety, health, morals, comfort and welfare, relating to [the] . . . use of streets [and the] . . . use of buildings and other structures" as well as ordinances "providing appropriate administrative and judicial proceedings, remedies, and sanctions for the administration and enforcement of such ordinances and amendments." [2]

---

**2.** Although Maloney has complained that § 59–A–5.7 intrudes upon the jurisdiction of other county agencies, which it clearly does, the company has not attacked the ordinance on the ground of its being *ultra vires,* and thus that question was neither decided below nor argued before us. We shall assume that the provisions noted above— §§ 5(J), 5(S), and 5(T)—provide sufficient authority to the county to vest some part of its jurisdiction over nuisances in the board of appeals. We do note, however, two areas of possible concern. First, § 5(U) of art. 25A seems to limit the board's jurisdiction to certain specific zoning, permit, and special assessment matters. Control over nuisances does not appear to be included within that grant of authority. Section 5(U) has been implemented through §§ 2–108—2–116 of the county code. In particular, § 2–112 specifies the "functions and powers" of the board of appeals, and nothing is said therein about the prevention or abatement of nuisances.

Second, § 59–A–5.7, being part of the county zoning law, was apparently enacted by the county council sitting as a district council under the authority of the Park and Planning Commission law (Md. Code Ann. art. 28, §§ 8–101—8–102), and not by the county council sitting as the general legislative branch of the county government. The authority conferred by §§ 5(J), 5(S), and 5(T) could be construed to run to the county council only in its general legislative capacity. In that event, the question may be raised whether § 59–A–5.7 really represents the proper exercise of the enabling authority of §§ 5(J), 5(S), or 5(T). If it does not, but rests instead upon the zoning authority in the Park and Planning Commission law, the conflicts

The authority to control nuisances, as conferred by those provisions of State law, has been exercised in comprehensive fashion by Montgomery County through the enactment of chapters 3 and 31B of the county code which, together, vest jurisdiction to control nuisances arising from air and noise pollution in the director of the county department of environmental protection. A comparison of those chapters with § 59–A–5.7 is illuminating.

Chapter 3 (§§ 3–1—3–17) concerns air quality control. It empowers the director to "[s]upervise the execution of all laws, rules and regulations pertaining to air pollution as provided in this chapter," to adopt regulations controlling emissions, and to order the abatement of certain nuisances. Unlike § 59–A–5.7, however, this law provides standards for the exercise of that authority. It defines the basic terms—"air pollution," "air pollutant," and "nuisance." Except for noise, vibrations, and "other disturbances," pollutants subject to the director's jurisdiction are precisely those mentioned in § 59–A–5.7—smoke, gas, dust, odor, particulate matter. To be abatable as "pollution," however, those substances must be present in the outdoor atmosphere "in such quantities and of such duration as are or may tend to be injurious to human, plant or animal life, or property, or which unreasonably interferes with the comfortable enjoyment of life or property or with the conduct of business." *See* § 3–2. No such standard appears in § 59–A–5.7.

Section 3–10(b) authorizes the director to issue an abatement order when he determines "that a nuisance *as defined by this chapter exists* " and affects a certain percentage of

---

between it and § 5(U) and between it and § 2–112 of the county code become more pronounced and more serious. Moreover, § 59–A–5.7 has nothing to do with zoning or the zoning process; indeed, it purports to authorize the board of appeals to act in complete derogation of the basic zoning law—to declare illegal, and thus criminal, uses that are expressly permitted under the zoning law. It therefore may be questioned whether that section represents a proper exercise of the county's authority under the Park and Planning Commission Law.

the people exposed to it. (Emphasis added.) For this purpose, a nuisance is defined as "[e]nvironmental conditions, intermittent or continuous, produced or correctible by human agency, prejudicial to reasonable enjoyment of health, comfort or safety of any individual or causing injury or damage to persons, property or the conduct of business." Sec. 3.2.

The same relative precision appears in the noise control law. The basic terms are defined; the prohibitions are clearly stated; hardship exemptions are allowed. *See* § 31B-2 (definitions), §§ 31B-5—31B-9 (permissible sound levels), §§ 31B-12 and 31B-13 (exemptions).

None of this appears in § 59-A-5.7. The board is authorized to prohibit that which may be perfectly legal under the zoning laws, the air quality control law, the noise control law, and indeed under the common law of nuisance, without any fixed criteria other than the listed sources of the pollution.

In *Bowers*, the Court noted that "[a]s a general rule, the constitutionality of a statutory provision under attack on void-for-vagueness grounds must be determined strictly on the basis of the statute's application to the particular facts at hand." 283 Md. at 122, 389 A.2d 341. That does not help here.

■ For a public nuisance to exist, "[t]here must be some interference with a public right." *Restatement of Torts 2d*, § 821B(1), comment g; also Prosser and Keeton, *Law of Torts*, 5th ed., § 90. The evidence before the board was, at best, equivocal in that regard. The principal complaint, in terms of interference with a public right, had to do with what was alleged to be the illegal parking of the trucks along Arlington Avenue. Yet the county code vests full authority over traffic control and parking regulations in the county executive, not the board of appeals, and provides a normal and usually effective mechanism for enforcing those regulations. *See*, in general, Montgomery County Code, ch.

31. The second complaint concerned the noise. The board was informed, however, but apparently chose to ignore, that Maloney had applied to the director of the department of environmental protection for a special exemption from the statutory noise level requirements and that, at the time of the proceeding before the board, that application was still pending.

Finally, there were complaints about the dust. Two of Miller's tenants complained that occasionally their cars were covered with dust; Mr. Miller complained that, at one point, a part of one of his buildings was discolored by dust; one tenant, on one occasion, had to clean his air conditioner filter; and one resident had experienced a long-time problem with dust on her porch and lawn.

With the possible exception of the dust settling on Ms. Berger's porch and the one episode of the discoloration of a part of one of Mr. Miller's buildings, there was no evidence of the kind and quantity of detriment or interference that is usually required to find a common law nuisance. *See, for example, Gorman v. Sabo,* 210 Md. 155, 122 A.2d 475 (1956); *Bishop Processing Co. v. Davis,* 213 Md. 465, 132 A.2d 445 (1957); *Adams v. Michael,* 38 Md. 123 (1873); *Dittman v. Repp,* 50 Md. 516 (1879); *Euler v. Sullivan,* 75 Md. 616, 23 A. 845 (1892); *Taylor v. M. & C.C. of Balt.,* 130 Md. 133, 99 A. 900 (1917).

In summary, then, we have an ordinance that permits a board to subject a citizen to criminal penalties for using his property in a manner that is, or may be, otherwise lawful, and to do so in derogation of the jurisdiction carefully and expressly conferred on other agencies, all without any clear standards and upon evidence that in no way compels the conclusions reached. That does not comport with due process of law.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.