795 A.2d 107

## UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION

v.

**Janet MALORY, Personal Representative of the Estate of Jamal Malory, a Minor, et al.**

No. 1883, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Oct. 31, 2001.

Reconsideration Denied Dec. 31, 2001.

328

Ralph S. Tyler (Hogan & Hartson, LLP, Mairi Pat Maguire and Goodell, De Vries, Leech & Dann, LLP on the brief), Baltimore, for appellant.

George S. Tolley, III, Timonium, and John A. Vail, Washington, DC (Henry E. Dugan, Jr., Ruth A. Jakubowski and Dugan & Jakubowski, P.A., Timonium, on the brief), for appellees.

Argued Before DAVIS, SALMON and DEBORAH S. EYLER, JJ.

DAVIS, Judge.

Appellees/cross-appellants Janet Malory (Janet), personal representative of the estate of decedent Jamal Malory (Jamal), and Markieta Malory (Markieta), mother of Jamal, brought suit against appellant/cross-appellee University of Maryland Medical System Corporation in the Circuit Court for Baltimore City on December 17, 1998. Both claims alleged medical malpractice, contending that appellant deviated from medical standards of care by failing to admit Jamal to the hospital on March 15, 1996 for overnight monitoring of his respiratory condition. As a result, appellees contended, Jamal died the next day-March 16, 1996. Janet's claim was a survival action brought on behalf of Jamal's estate and Markieta's claim was a wrongful death action. The jury returned a verdict for appellees, awarding $3,500,000 to Markieta and $202,344 to Jamal's estate. Judgment on the verdict was entered on February 28, 2000. Pursuant to Md.Code (1995 Repl.Vol., 1998 Supp.), Cts. & Jud. Proc. (C.J.) § 11–108, however, the trial court reduced the wrongful death award to $515,000–the maximum allowed under the cap on non-economic damages. The modified judgment was entered on October 12, 2000.

Appellant noted its timely appeal on October 16, 2000 and appellees noted their cross-appeal on October 20, 2000.

Appellant raises four questions, which we rephrase for clarity as follows:

I. Did the trial court commit reversible error when it misled the jury with incorrect instructions on the law pertaining to wrongful death actions?

II. Did the trial court commit reversible error when it admitted into evidence the videotape discovery deposition of Lourdes deArmas, M.D., which failed to conform with the Maryland Rules of Procedure and Evidence?

III. Was it reversible error to submit the estate's claim for conscious pain and suffering to the jury when appellees failed to produce evidence that the decedent consciously suffered pain before his death?

IV. Did the trial court commit reversible error in ruling that a paramedic's first-hand observations at the scene were hearsay?

In addition, appellees raise the following issue, also restated for clarity, on cross-appeal:

V. Is Maryland's cap on non-economic damages, as stated in C.J. § 11–108, unconstitutional?

We answer questions I, II, and III in the affirmative and questions IV and V in the negative. In light of our holding, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

## STATEMENT OF FACTS

Jamal was two years old in March 1996 when the events leading up to this case occurred. He lived with both appellees-his mother, Markieta, and his grandmother, Janet. Throughout his brief lifetime, Jamal had a history of respiratory illness, having been treated twice for pneumonia.

On March 14, 1996, Jamal developed a cold, with congestion, wheezing, and a cough. Because he was crying and fussing all

night, Janet slept with him on the couch. He woke up repeatedly during the night, coughing and wheezing.

The next morning, noticing that her son had not improved, Markieta took Jamal to the office of Lourdes deArmas, M.D. at Total Health Care (THC) in Baltimore, complaining that her son was suffering from a runny nose and congestion. Dr. deArmas treated him for bronchial constriction, based on his congestion and chest retractions. Unfortunately, Jamal did not respond to the treatment and, by 11:30 a.m., concerned by his desaturated blood oxygen level and dusky skin color (consistent with an episode of hypoxia), gave Jamal a nebulizer/oxygen treatment and instructed someone to call "911" in order to take him to appellant's Emergency Room (ER).

Arriving at the ER at approximately 12:00 noon on March 15, 1996, Jamal's color was good; his skin temperature was normal; he appeared to be alert; however, he continued to have loose, rattly sounds when he breathed. For this condition, he was given another nebulizer treatment, which made him lethargic, but brought his pulse oximetry reading up to 98%, which was normal. The nurses continued to keep him on a 50% level of supplemental oxygen to aid him in his breathing.

At approximately 1:35 p.m., Jamal experienced a second down-turn in his oxygen levels, dropping to below-normal saturation levels. Upon the nurses' suggestions, Markieta carried Jamal, anxious and crying, to an examination room where he was given another oxygen treatment to alleviate his hypoxia. At that point, Dr. Young, appellant's pediatric attending physician, was called to evaluate Jamal. Although Young noted that Jamal was awake, alert, and had no wheezes or obstruction of air flow into and out of the upper airway, she ordered an x-ray of Jamal's chest in order to exclude the possibility of an obstructing lesion in the upper airway. The x-ray confirmed that there was not an obstruction, but that Jamal was merely suffering from a respiratory infection.

Jamal was then monitored in the ER for four more hours and was discharged at 4:05 p.m. At that time, his pulse

oximetry remained above 96% (above normal), and he had good air movement and was stable and alert. Markieta was instructed to bring Jamal in for a follow-up visit the next day.

At home on the evening of March 15, 1996, Jamal's health improved and he went about his usual activities-eating a dinner of sardines, crackers, and noodle soup. Jamal fell asleep in Markieta's bed after his bath. Although Markieta applied Vapo Rub to his chest and nose, Jamal woke frequently during the night, coughing and crying.

At approximately 10:30 a.m. on March 16, 1996, Markieta awoke to find Jamal lying in bed unresponsive. While Janet performed cardiopulmonary resuscitation (CPR), Markieta called "911." Jamal never regained consciousness, never moved, never opened his eyes, and never became responsive.

During their efforts to resuscitate Jamal, the paramedics and the firefighter who responded to the call noticed a strong chemical, solvent-like, toxic odor coming from his mouth and nose. They suspected Jamal had ingested a toxic substance, based on a bottle found in the home; however, a subsequent police investigation at the house found no evidence of a bottle. Upon arrival at the ER, Jamal was in full cardiopulmonary arrest and, at 11:25 a.m., less than one hour after Markieta called "911," Jamal was pronounced dead. Although the paramedics suspected he had ingested a toxic substance, the Chief Medical Examiner's Office found the cause of Jamal's death to be cardiac arrhythmia.[1]

## DISCUSSION

Our only role as an appellate court in reviewing a jury's decision is to determine whether the evidence was legally sufficient to permit the judge, as a matter of law, to submit the case to the jury. *Starke v. Starke*, 134 Md.App. 663, 679, 761 A.2d 355 (2000). When determining the sufficiency of that evidence, it is imperative that we view the evidence in the light most favorable to the prevailing party

---

1. Additional facts will be set forth in the discussion of the issues.

below, in order to determine whether "there [was] some evidence in the case, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all of the elements necessary to prove that the ... tort[-]feasor committed the tort...." *Id.*

# I

Appellant contends that the trial court committed reversible error when it provided the incorrect instruction on the law pertaining to wrongful death actions and that, because of this error, the jury's verdict should be reversed as it is unclear. "Specifically," appellant argues, "the trial court's instructions failed to inform the jury that[,] in order to find [appellant] liable, [it] must find that [appellant's] negligence caused Jamal Malory's death. Rather, the trial court instructed the jury only that [appellant's] negligence must have caused 'any injury' to [appellees]."

The crux of appellant's argument centers around the instructions given to the jury on the verdict sheet. Those instructions, in relevant part, were as follows:

If you decide in answering the question that you have decided for [appellees] as to the first portion, if you will, of that of the verdict sheet, and that is that you found that [appellees] have proven by a preponderance of the evidence that [appellant] was in fact negligent in its actions as a breach of the standard of care and that you find that in fact that it has been proven by a preponderance of the evidence, and that [appellees] have proved by a preponderance of the evidence that the negligence of [appellant] did in fact cause damage to [appellees], then you must consider damages to which [appellees are] entitled, if any.

In addition to the instructions, appellant takes issue with Question 2 of the verdict sheet, which states, in relevant part: "Do you find that the negligence of [appellant] was the proximate cause of any injury to the said [appellees]?" Appellant contends that the trial judge's instructions were incorrect

because they included the phrase "any injury," as opposed to "death." As a result, appellant continues, the jury was left "believing that all it had to do was find: (1) whether [appellant] breached the standard of care; and (2) whether that breach caused 'any injury' to appellees, in order to find [appellant] liable for [a]ppellees' wrongful death action." This exception to the trial court's jury instructions was properly noted on the record and was, therefore, preserved for appeal. Rules 2–520(e) and 4–235(e).

Appellees counter that appellant is complaining "that a single sentence, lifted from the trial court's lengthy jury instructions, confused and misled the jury. When read as a whole, however, the jury instructions set forth the applicable law on the issue of causation, thus there was no reversible error." The use of the word "injury" as opposed to "death," appellees contend, is not in derogation of Maryland case law, because appellees must only prove that appellant's breach of the standard of care caused the harms complained of—the suffering and death of Jamal. We disagree.

■ "[T]he standard of review for jury instructions is that so long as the law is fairly covered by the jury instructions, reviewing courts should not disturb them." *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46, 733 A.2d 1014 (1999). This standard "places the burden on the complaining party to show both prejudice and error." *Molock v. Dorchester County Family YMCA,* 139 Md.App. 664, 672, 779 A.2d 963 (2001).

In order to determine whether the instructions, as provided by the trial court, rise to the level of commanding a reversal of the jury verdict, we must look to the underlying objective of jury instructions. We have previously stated that

[t]he purpose of jury instructions is to aid the jury in clearly understanding the case and ... to provide guidance for the jury's deliberations by directing [its] attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict.

*Id.* Because the trial court has the responsibility to guide the jury with respect to the law relevant to the issues and evidence presented at trial, the court in the case *sub judice* was obligated to provide the jury with a roadmap of the law as it related to wrongful death actions, not the broad realm of medical malpractice claims.

"A *prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of." *Weimer v. Hetrick,* 309 Md. 536, 553, 525 A.2d 643 (1987). While the instructions provided to the jury in the case at hand sufficiently explained elements one and two above, it is the third element that is at issue here. In a wrongful death action, a plaintiff is clearly complaining of the death of the victim. A statement broadly encompassing all injuries fails to establish with specificity the injury for which the plaintiff seeks redress.

There is an important distinction between a survival action and a wrongful death action, although both may arise out of a single medical malpractice claim. As explained by the Court of Appeals in *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906), "[i]n determining the measure of damages the nature of the statute under which the action is brought is to be closely observed," because the actions "accomplish different results and stand on different bases, secure different damages and are for the benefit of wholly different persons." *Id.* at 342–44, 65 A. 49. Pursuant to C.J. § 3–902, "[a]n action may be maintained against a person whose wrongful act *causes the death of another.*" (Emphasis added.) It is worthy of mention that the predecessor to this section was commonly known as Maryland's Lord Campbell's Act, codified as ch. 299, Acts of 1852 and entitled, "Negligence Causing Death." *Storrs v. Mech,* 166 Md. 124, 170 A. 743 (1934). Although the name of the cause of action has changed, the emphasis on the death of the victim has not. Accordingly, this causal link between one's actions and the resulting death of another, included within the wrongful death statute, is clearly

of great consequence. As stated in C.J. § 3–901(e), the definition of "wrongful act" means "an act, neglect, or default ... which would have entitled the party injured to maintain an action and recover damages *if death had not ensued.*"

██ Clearly, a plaintiff must be successful in proving that the actions of a defendant caused the *death* of the victim. *See, e.g., McKeon v. State,* 211 Md. 437, 127 A.2d 635 (1956); *Ash v. Baltimore & O.R. Co.,* 72 Md. 144, 19 A. 643 (1890); *Barrett v. Charlson,* 18 Md.App. 80, 305 A.2d 166 (1973). The failure of a plaintiff to prove a causal connection between the alleged death of the victim and the alleged negligence of the health care provider will consequently result in the finding of a verdict for the defendant. *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977). Any jury instruction making a sweeping generalization as to the injury suffered, rather than identifying death as the only injury at issue, therefore, constitutes clear error. In the case at hand, the trial court failed to distinguish the wrongful death and survival actions and, as a result, instructed the jury with confusing, misleading, and incorrect statements of law.

██ Appellee counters this assail on the jury verdict by pointing to Rule 2–520. "As Maryland Rule 2–520 makes clear, a court need not give a requested instruction, even if it may be a correct exposition of the law, 'if the matter is fairly covered by instructions actually given.'" *Kennelly v. Burgess,* 337 Md. 562, 577, 654 A.2d 1335 (1995)(quoting *Dover Elevator Co. v. Swann,* 334 Md. 231, 258–59, 638 A.2d 762 (1994)). As explained above, however, the trial court omitted the necessary standard for a wrongful death action arising out of medical malpractice. Merely instructing the jury to enter a verdict for the plaintiffs, in the event *any injury* can be found, does not present "a correct exposition of the law." *Id.* It is impossible to determine whether the jury would have reached the same result without such an imprecise restatement of law. Because we perceive reversible error in the trial court's instructions, which could cause potential confusion in the

minds of the jurors, we hold that the court's refusal to instruct the jury as requested constitutes reversible error.

## II

Appellant next contends that the decision of the trial court to allow into evidence the videotaped deposition of Dr. deArmas constituted reversible error, because the deposition failed to conform with Maryland Rules of Procedure and Evidence. Appellees counter that, because Dr. deArmas constituted an unavailable out-of-State witness, the trial court properly admitted her videotaped deposition testimony.

Dr. deArmas treated Jamal at THC on March 15, 1996 in response to Markieta's statements that Jamal was having difficulty breathing. During the course of her treatment of Jamal, Dr. deArmas concluded that he would receive better care in the ER and, as a result, she placed a call to "911." Dr. deArmas never saw Jamal again after he was taken to the ER at appellant's facility. Shortly after Jamal's death, Dr. deArmas moved to McIntosh County, Georgia, for reasons wholly unrelated to the present litigation.

On November 3, 1999, appellant deposed Dr. deArmas in Georgia for discovery purposes. Although the Notice of Deposition did not request that the deposition be videotaped or that it be taken for future use at trial, appellees arranged for a videotape recording of the deposition. Counsel for appellant did not know of appellees' intent to videotape the deposition prior to their arrival in Georgia. Appellant refused to take a *de bene esse* deposition, but allowed the deposition to proceed, in light of the fact that the witness and the attorneys representing all parties were present. Dr. deArmas, although initially designated by appellees as an expert, testified solely as the treating physician. The parties agreed that Dr. deArmas's deposition would not be used at trial and that, in the event she was unable to appear at trial, appellant would be able to take a more thorough trial deposition. Appellant was never able to conduct a second deposition, however, and Dr. deArmas failed to appear to testify at trial. Over objection, appellees offered

her videotaped deposition testimony at trial. The trial court admitted the testimony.

Appellant points us to the two-step process established in *Shives v. Furst,* 70 Md.App. 328, 521 A.2d 332 (1987), constituting the well-settled analysis to be followed when determining admissibility of a deposition.

Speaking metaphorically, a deposition is like a box that contains certain evidence. [A trial] court must make two determinations. The first is a procedural one: whether to admit the box itself into the trial. In making this assessment, the court applies Maryland Rule 2–419. Once the court has decided that the deposition meets these procedural requirements, the court then must address the ancillary evidentiary issues such as whether the contents of the box qualifies as admissible evidence. This step is akin to opening the box, assessing its content[s] and then ruling on its admissibility. Logically speaking, this step must be subsequent to the initial step of determining whether there was technical compliance with the procedural requirements. If there was not technical compliance with the rule, there would be no need to reach the second step.

*Id.* at 334, 521 A.2d 332. Failure by the deposition to satisfy either of these steps will render it inadmissible. Based on *Shives,* appellant argues that the videotaped deposition is inadmissible. Procedurally, claims appellant, appellees failed to conform with Rule 2–419; substantively, appellants claim the testimony of Dr. deArmas is inadmissible under the Maryland Rules of Evidence, because her testimony constitutes the improper opinion of a lay witness and inadmissible hearsay.

As appellant correctly points out, the technical procedures for using a deposition at trial are contained in Rule 2–419. Particularly relevant is subsection (a)(4), which provides for the use of videotape depositions as follows: "[a] videotape deposition of a treating or consulting physician . . . may be used for any purpose even though the witness is available to testify if the notice of that deposition specified that it was to be taken for use at trial." The filed notice to depose Dr.

deArmas contained no mention of the possibility of a video-taped deposition; therefore, absent a waiver, it would have been inadmissible. The trial court found, however, that

> based on the circumstances that the deposition, while it being in a manner of surprise by the [appellant] as such, was under control of the [appellant]. And that under the circumstances is that [sic] it should not have been originally placed on the video, but *it was waived* under those manners.

(Emphasis added.)

We must then decide whether the trial court correctly determined that appellant waived its objection to the form of deposition. For that analysis, *Mayor & City Council of Baltimore v. Theiss*, 354 Md. 234, 729 A.2d 965 (1999), is controlling. Faced with facts strikingly similar to the case *sub judice*, the Court of Appeals stated that

> [a] trial judge's waiver determination depends upon whether, at the time the objection was, or could have been, made, the objectionable matter was curable or noncurable. If the matter was curable and the nonquestioning party either failed to object, or failed to specify the basis of the objection, the matter is waived. If the matter was curable, properly objected to with the ground specified, and not cured during the deposition, the objection is preserved. Therefore, the issue of waiver is frozen at the time of the deposition. . . .

*Id.* at 255, 729 A.2d 965. The Court continued, stating which objections are curable and therefore waived if the party fails to immediately object:

> An error or irregularity occurring at the oral examination *in the manner of taking the deposition* . . . or in the conduct of parties and an error of any kind which might be obviated, removed, or cured if promptly presented, is waived unless seasonable objection thereto is made at the taking of the deposition.

*Id.* at 249, 729 A.2d 965 (emphasis added).

▋ Appellant argues that the deposition was never permitted to be videotaped for use at trial. Rather, appellant's

counsel merely permitted the videotaping of the discovery deposition, which was standard procedure for appellees' counsel, in an attempt to maintain a cooperative relationship between the parties, in light of the fact that all parties had already traveled to Darien, Georgia. In light of this, appellant contends, appellees' argument that counsel waived any objection should be disregarded. Nevertheless, she made no objection, but rather permitted the videotaping to proceed. Had appellant objected to the videotape recorder during the deposition, the format of the deposition could have been cured. Therefore, appellant's objection as to form of the deposition is a curable objection under the above analysis and the failure to raise it constitutes a waiver. Because appellant's counsel permitted the videotaping of the deposition to proceed, we conclude that the trial court correctly ruled that appellant waived any objection.

Continuing its attack on the "box" of Dr. deArmas's deposition, appellant contends that it does not conform with Rules 2–419(a)(3)(B), which allows for the use of a deposition at trial in the event the witness is unavailable and that unavailability was not procured by the deposition's proponent, and 2–419(a)(3)(E), which allows for the use of a deposition at trial if the proponent of the testimony can prove exceptional circumstances, which, in the interest of justice, would mandate its admission. Based on these rules, appellant argues that "[a]ppellees failed to exercise reasonable diligence in obtaining Dr. deArmas'[s] trial testimony and, through inaction and delay, prevented [appellant] from obtaining her testimony. Appellees thus procured the absence of Dr. deArmas's trial testimony." In the alternative, appellant contends that appellees failed to file a motion to support a possible argument under Rule 2–419(a)(3)(E).

At trial, the court found that Dr. deArmas was unavailable, under the meaning of the term in the Maryland Rules, because she was in Darien, Georgia, "not in the [S]tate of Maryland and subject to [its] subpoena and enforcement, or order." Appellees contend that the "trial court was well

within its discretion to conclude that Dr. deArmas was unavailable to testify, due to an outbreak of influenza in rural southeastern Georgia." They argue that this outbreak, clearly out of their control, is the reason Dr. deArmas's deposition was admissible. Appellant counters that appellees procured the unavailability of this witness and that, therefore, the deposition should be inadmissible. We agree with appellant and hold that appellee prevented appellant from obtaining Dr. deArmas's testimony.

Appellant deposed Dr. deArmas in the capacity of a discovery deposition, with the understanding, prior to commencement of the deposition, that Dr. deArmas would be offered for a separate trial deposition, in the event she was unable to testify at trial in Baltimore. According to appellant, "[c]ritical facts about the authenticity of her medical records and her motives in creating those medical records were discovered *after* [Dr.] deArmas'[s] deposition." Because of this, appellant's counsel was concerned about whether appellees would be calling Dr. deArmas at trial or whether they intended to schedule her *de bene esse* deposition. Although appellant's counsel attempted to secure this information from appellees on several occasions, appellees failed to respond.

Appellant contends, citing *Myers v. Estate of Alessi,* 80 Md.App. 124, 560 A.2d 59 (1989), that appellees did not have the right to offer Dr. deArmas's deposition testimony under Rule 2–419(a)(3)(B)'s exception, because they caused Dr. deArmas to be unavailable. In *Myers,* we were presented facts similar to the case at hand. That controversy also centered around a key witness, who resided outside of the State and, therefore, was beyond the subpoena power of the State. In analyzing that case, we looked to *Bartell v. Bartell,* 278 Md. 12, 357 A.2d 343 (1976), wherein the Court of Appeals opined that, because "it was critically important that [the witness] personally testify before the court ... [and][s]ince it was he and he alone who was responsible for his absence from the State and from the trial court, the chancellor did not err in excluding the deposition." *Myers,* 80 Md.App. at 139, 560 A.2d 59. From that rationale, we reached the conclusion in

*Myers* that the out-of-state witness's deposition was inadmissible, because the proponent of the deposition had refused to do something completely within that party's control-pay the expert's fee. Here, faced with a situation completely within appellees' control, we must glean from *Myers* and *Bartell* the proper approach to the unavailability of witnesses. We therefore conclude that appellees had control over the witness and the circumstances surrounding her availability to testify either at trial or in another deposition. Under *Myers*, this control mandates a determination that Dr. deArmas was, indeed, available.

Because appellees' argument under 2–419(a)(3)(B) fails, we next consider appellees' alternative argument. Pursuant to Rule 2–419(a)(3)(E),

upon motion and reasonable notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.

In other words, "a party must give 'reasonable notice,' when making a motion that 'exceptional circumstances' dictate the admission of a deposition[,] even though the technical requirements of Rule 2–419 have not been fulfilled." *Shives*, 70 Md.App. at 339, 521 A.2d 332. Appellees failed to file such a motion and, as a result, no such notice of a motion was ever provided to appellant. We therefore hold that Dr. deArmas's deposition testimony was improperly admitted at trial, because it failed to satisfy the elements. In light of our holding as to the "box," it is unnecessary to discuss the merits of appellant's attacks on the "contents."

### III

Appellant's third contention is that appellees failed to provide evidence that Jamal suffered pain before his death and that, as a result, the trial court committed reversible error in submitting the estate's claim for conscious pain and suffering to the jury. Appellees counter that appellant "ignores the testimony of its own expert witness, [Dr. Charles King], which

supported the jury's finding that Jamal experienced conscious suffering and fright caused by the negligence of [appellant's] agents and employees."

The law in Maryland regarding the issue of recovery for conscious pain and suffering is well settled. In such an action, the plaintiff must establish, by a preponderance of the evidence, that the defendant's negligence was the direct and proximate cause of the incident and that the deceased experienced conscious pain and suffering as defined by Maryland law. *Ory v. Libersky,* 40 Md.App. 151, 159–60, 389 A.2d 922 (1978). In light of this rule, appellant argues that "[a]ppellees were required to establish that Jamal suffered conscious pain relating to his death on March 16, 1996." Appellant is correct in its restatement of the law in Maryland and its effect on appellees' burden of proof.

At trial, King explained the anguish a person will feel when confronted with hypoxia, or a loss of oxygen:

> Well, imagine somebody takes a belt, puts it around your neck, and pulls it tight so that you can't move air. You can't even go "ah" (demonstrating by making a choking sound). You can't make a sound. What do you do? The child does the same thing. Do you just faint and pass out? No. You get progressively crazier and crazier, and more and more out of your mind. And those are the people, who, adults in the emergency department, will take a swing at you, because they have two things. One is, they are choking to death. And the other is, as the oxygen level in their brain goes down, they go nuts. Hypoxia causes you to get agitated. That's one of the things you should always think about first when you see an agitated patient. Do they not [sic] getting enough oxygen for some reason? So, what would this kid do? A two[-]and[-]a[-] half year[-]old would climb the side of your head and claw your face off if you were nearby. You're not going to sleep through that. Nobody would. It is a dramatic and rapid form of death. It's quick.

This testimony was elicited from appellant in order to support its contention that Markieta could not have slept through the night had Jamal suffered from hypoxia, as appellees claim. Appellees argue, however, that this testimony provided sufficient evidence of the conscious pain and suffering Jamal encountered and that it was corroborated by another expert, Dr. John Carroll, also provided by appellant.

Appellees correctly point out that, "[i]n performing its fact[-]finding role, the jury is free to accept the evidence that it believes and reject that which it does not," *Hill v. State,* 134 Md.App. 327, 355, 759 A.2d 1164 (2000), concluding in their argument that

> the jury chose to accept the compelling evidence that Jamal Malory died of a respiratory cause, but that, tragically, his mother did not wake up. Accordingly, the testimony of [appellant's] own experts supported a "reasonable inference" that Jamal suffered a period of intense conscious suffering and fright before his death.

*Id.* (citing *Beynon v. Montgomery Cablevision Limited Partnership,* 351 Md. 460, 508–09, 718 A.2d 1161 (1998)).

The *Beynon* decision dealt with an issue previously unaddressed by the [Court of Appeals]: "[w]hether 'pre-impact fright,' or any other form of mental and emotional disturbance or distress, suffered by an accident victim who dies instantly upon impact is a legally compensable element of damages in a survival action." *Id.* at 463, 718 A.2d 1161. Recognizing that Maryland case law supports the concept that "damages may be recovered for physical injuries caused by or resulting from fright or shock absent physical impact," the Court held that the estate could recover such damages, because in the event the deceased had lived, he would have been able to recover them. *Id.* at 500, 718 A.2d 1161 (quoting *Green v. T.A. Shoemaker & Co.,* 111 Md. 69, 77–78, 73 A. 688 (1909)). In proving such fright, the Court also noted that "[d]irect evidence is not necessary. What is required is evidence from which a reasonable inference could be drawn that the decedent experienced fear or fright." *Id.* at 508, 718 A.2d 1161. This

**348.**

case can be distinguished from the case at hand, however, because the facts are different. *Beynon* pertained to a conscious driver, who was certain to incur injuries from a known obstacle. For this reason, we decline to follow its analysis.

The amount of evidence required to rise to the level of being sufficient to support a finding of conscious pain and suffering was discussed in *Ory, supra.* As stated above, under *Ory,* appellees would have to have proven by a preponderance of the evidence that, from the time the allegedly negligent medical care was provided up until Jamal's death, Jamal suffered conscious pain. *Ory,* 40 Md.App. at 159–60, 389 A.2d 922. We hold that appellees failed to produce such evidence.

 By the accounts of all witnesses at trial, Jamal was unconscious from 10:30 a.m. on March 16, 1996, until 11:25 a.m. that same morning, when he was pronounced dead. Markieta, who first found Jamal, testified that he was unconscious when she awoke that morning; Janet, who performed CPR on her grandson, testified that he stayed unconscious despite her efforts; the paramedics and firemen, who answered appellees' "911" call, testified that he was unconscious at all times while they were present; and the health care providers at appellant's facility all maintained that Jamal was unconscious upon arrival at the ER. Appellees contend that the testimony of King and Carroll satisfies the evidentiary requirements set forth in *Ory;* however, this testimony is mere speculation and "Maryland has long followed the general principle that, 'if compensatory damages are to be recovered, they must be proved with reasonable certainty, and may not be based on speculation or conjecture." *Beynon,* 351 Md. at 513, 718 A.2d 1161 (Wilner, J., dissenting). It was, therefore, reversible error for the trial court to allow the issue of damages for conscious pain and suffering to go to the jury.

## IV

▪ Appellant's final contention is that the trial court committed reversible error in ruling that the first-hand observations of Paramedic Melissa Reinhardt, made upon respond-

ing to Janet's "911" call, were hearsay. Specifically, appellant takes issue with the trial court's ruling as to Reinhardt's testimony regarding the bottle containing what was believed to be hair relaxer. Appellant contends that the trial court incorrectly found Reinhardt's testimony to be hearsay and, in the alternative, that Reinhardt's statements were within an exception to the rule against hearsay.

Appellees maintain that the trial court correctly excluded this "previously undisclosed evidence alleging the existence of a 'bottle'—which was never identified by . . . Reinhardt in her ambulance report." Appellees conclude that appellant's failure to disclose this evidence "constituted an obvious violation of [appellant's] discovery obligations and, coming as it did at the end of trial, was overwhelmingly prejudicial to appellees. The [trial] court properly struck the testimony and excluded any further surprise evidence from the paramedic on that subject."

"Maryland law is well settled that a trial court has broad discretion to fashion a remedy based on a party's failure to abide by the rules of discovery." *Bartholomee v. Casey,* 103 Md.App. 34, 48, 651 A.2d 908 (1994)(citing *Taliaferro v. State,* 295 Md. 376, 398, 456 A.2d 29 (1983)). The trial court found that appellant failed to conduct the disputed line of questioning during discovery and, as a result, was forbidden to conduct it during trial. This remedy is supported by the holding in *Bartholomee,* that "the injury inherent in failure to make discovery is unfair surprise. It would seem that the only effective cure for this disease is preclusion of the material withheld." *Id.* In light of such authority, we see no abuse of discretion in the trial court's decision to strike this line of testimony. We, therefore, hold that the testimony was properly excluded. Notwithstanding this holding, however, we will discuss the merits of appellant's arguments regarding the hearsay rules.

At trial, Reinhardt testified that she asked Paramedic Danny Atkins, "What is that? What is that smell?" She testified concerning her further inquiry as follows:

[APPELLANT'S COUNSEL]: Did you speak to anyone other than your partner, Danny Atkins, concerning the odor?

[WITNESS]: Because we were working with him, we asked one of the fire fighters, who was otherwise available to ask the family if [Jamal] had been sick, or if, you know, there was, if he was around anything, if there was anything, you know, if they could find any information at all for us to help us figure out what was going on.

[APPELLANT'S COUNSEL]: And what information, if anything, did you learn?

[WITNESS]: I remember somebody came back, because we were outside, somebody came to the back door [of the ambulance and] told us he might of [sic] drank this. And they held up a bottle.

[APPELLANT'S COUNSEL]: Can you describe the bottle?

[APPELLEES' COUNSEL]: Objection, your Honor.

Thereafter, the trial court asked counsel to approach the bench. Appellees' counsel objected to this testimony, positing that "[t]here's been a police investigation. They were at the house. They investigated it. There's no evidence at all that there was any bottle recovered of anything." Appellant's counsel, on the other hand, argued that Reinhardt was describing her contemporaneous first-hand observations. The trial court determined this testimony to be hearsay, stating that "[s]he's testifying what she observed ... someone else doing ... or saying." Appellant contends that this ruling was an abuse of discretion and that because it was prejudicial, constitutes reversible error. As the trial court correctly noted, however, hearsay includes oral or written assertions or nonverbal conduct of a person, if intended as an assertion. Rule 5–801. Because Reinhardt was testifying as to what another person believed *may have been* a toxic substance, appellant was attempting to establish the truth of an out-of-court statement.

Appellant argued in the alternative at trial that, in the event the court determined this testimony was hearsay, the testimony should fall within either the hearsay exception regarding present sense impressions, as stated in Rule 5–803(b)(1), the exception regarding excited utterances, as stated in Rule 5–803(b)(2), or the exception regarding statements for the purpose of medical diagnosis or treatment, as stated in Rule 5–803(b)(4). Appellees disagreed, positing that this testimony constituted hearsay not within any exception to the rule against hearsay. The trial court agreed with appellees, finding all three exceptions to be inapplicable and, as a result, sustained appellees' objection.

Pursuant to Rule 5–803(b)(1), "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter" constitutes an exception to the rule against hearsay. At issue is Reinhardt's statement that someone-either a paramedic or a firefighter-held up a bottle and implied that Jamal may have ingested its contents. The exception for present sense impressions does not apply here, because it is the observations of that unknown rescuer as he or she was looking at the bottle that Reinhardt is relaying, not her own personal observations of the bottle. The trial court correctly found the present sense impression to be inapplicable.

Rule 5–803(b)(2) provides that statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are also an exception to the rule against hearsay. As defined by case law, however, the rationale behind this exception is that the startling event suspends the declarant's process of reflective thought, thereby reducing the likelihood of fabrication. *State v. Harrell*, 348 Md. 69, 702 A.2d 723 (1997). In the case at hand, the paramedics and firefighters at the scene were attempting to determine what toxic substance, if any, Jamal ingested. By the very nature of their investigation, they were engaging in reflective thought; therefore, this exception does not apply. Additionally, we have held that we

will not reverse a trial court's decision to deny the admission of evidence under the excited utterance exception unless the trial court abused its discretion. *Stanley v. State*, 118 Md. App. 45, 701 A.2d 1174 (1997). We perceive no such abuse of discretion here.

Rule 5–803(b)(4) provides that "[s]tatements made for purposes of medical treatment or medical diagnosis in contemplation of treatment" are exceptions to the rule against hearsay. Appellant contends that,

> [t]he firefighter's act of holding up the bottle and his statement "he might of [sic] drank this" was made in response to a treating paramedic's question.... It was made to the people who were attempting to save Jamal's life and for the purpose of identifying the cause of Jamal's medical condition.

Appellant urged the trial court to admit this testimony into evidence as an exception under 5–803(b)(4). Testimony by a paramedic responding to an emergency call has been held to fall within this exception. *See Choi v. State*, 134 Md.App. 311, 759 A.2d 1156 (2000). As stated above, however, the trial court correctly excluded this testimony on other grounds and we affirm that decision.

## V

Appellees ask us on cross-appeal to "affirm the judgment of the [trial] court, but reverse the decision of the [trial] court as to its application of Maryland's cap on non-economic damages." Claiming that the cap, as stated in C.J. § 11–108, is unconstitutional, appellees posit that C.J. § 11–108 is a "special law" barred by art. III, § 33 of the Maryland Constitution; that C.J. § 11–108 constitutes a taking of private property, other than for a public purpose and without just compensation, in violation of art. III, § 40 and art. 5 and art. 19 of the Declaration of Rights; and that C.J. § 11–108 violates the separation of powers doctrine.

It is important to note at the outset that "statutes are generally presumed to be constitutional, ... they should not

be declared otherwise unless the repugnancy is clear, and . . . courts should avoid declaring a statute invalid if there is some less drastic way of deciding the case." *Edmonds v. Murphy,* 83 Md.App. 133, 142, 573 A.2d 853 (1990)(quoting *Miller v. Maloney Concrete Co.,* 63 Md.App. 38, 46–47, 491 A.2d 1218 (1985)). "The presumption of constitutionality attaches to the enactment of every statute. The burden is on [appellee] to overcome this presumption." *Id.*

Maryland Constitution, art. III, § 33 bars the General Assembly from passing special laws. It is appellees' contention that C.J. § 11–108 constitutes such a law, because it "relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class," as defined in *Cities Servs. Co. v. Governor,* 290 Md. 553, 567, 431 A.2d 663 (1981)(quoting *Littleton v. Hagerstown,* 150 Md. 163, 176, 132 A. 773 (1926)). "[I]n applying § 33 to determine whether an enactment affects less than an entire class and is, therefore, a 'special law,' [the Court of Appeals] has looked to the purpose of the constitutional prohibition." *Id.* at 568, 431 A.2d 663. Quoting *Montague, Ex'r v. State,* 54 Md. 481, 490 (1880), the Court of Appeals explained that the object of the constitutional prohibition

was to prevent or restrict the passage of special, or what are more commonly called *private Acts,* for the relief of particular named parties, or providing for individual cases. In former times, as is well known and as the statute books disclose, Acts were frequently passed for the relief of named individuals, such as sureties upon official bonds, sheriffs, clerks, registers, collectors and other public officers, releasing them sometimes absolutely, and sometimes conditionally from their debts and obligations to the State. The particular provision now invoked was aimed against the abuses growing out of *such legislation,* and its object was to restrain the passage of *such Acts,* and to prevent the release of debts and obligations in particular cases, and in favor of particular individuals unless recommended by the Governor or the Treasury officials.

*Id.* Stated another way: "One of the most important reasons for the provision in the Constitution against special legislation is to prevent one who has sufficient influence to secure legislation from getting an undue advantage over others." *Id.* at 568–69, 431 A.2d 663 (quoting *M. & C.C. of Baltimore v. U. Rwys. & E. Co.*, 126 Md. 39, 52, 94 A. 378 (1915)).

Appellees rely on *Cities, supra,* to support their contention that C.J. § 11–108 is a "special law" under Maryland law. In that case, however, the Court of Appeals held that the statute at issue "was sought by [appellant], that the Legislature was advised that one business was the sole beneficiary, that [appellant was] the only subsidiary of a producer or refiner which can qualify, and that no other existing general retail mass merchandiser could qualify in the future if it became a subsidiary of a producer or refiner," thus constituting a special law. *Id.* at 570–71, 431 A.2d 663. Here, we are faced with the task of determining whether a statute applying to all tort victims in the State of Maryland is a "special law." The law simply does not have the same effect as the statute at issue in *Cities;* rather, C.J. § 11–108 applies to "*any* action for damages for personal injury." (Emphasis added.) Therefore, it is a general law and does not violate the constitutional prohibition.

Appellees additionally argue that "the operation of [C.J.] § 11–108 would work [as] an uncompensated taking of ... appellees' property, namely, the verdict of the jury and the judgment entered upon it by the trial court below [sic]." According to appellees, "logic dictates" this conclusion, because a cause of action is considered personal property as is a judgment arising therefrom. "[I]f the contingent claim and the judgment are property, then the intermediate jury verdict is also property." This is an incorrect assumption, however. Although appellees are correct in stating that the claim and the final judgment are property, the jury verdict, subject to appeal and a subsequent alteration on appeal, is not a property interest; nor is it an entitlement. Because it does not constitute a property interest, there can be no denial of due

process. *Maryland Classified Employees Ass'n v. Schaefer,* 325 Md. 19, 26, 599 A.2d 91 (1991).

Appellees' final attack [2] on the constitutionality of C.J. § 11–108 challenges the statute under a separation of powers analysis. We were presented with this issue in *Murphy* and, as a result, our holding in that case is controlling:

The power of the legislature to abolish the common law necessarily includes the power to set reasonable limits on recoverable damages in causes of action the legislature chooses to recognize. The Court therefore agrees with [appellant] that if the legislature can, without violating separation of powers principles, establish statutes of limitations, establish statutes of repose, create presumptions, create new causes of action and abolish old ones, then it also can limit non-economic damages without violating the separations of powers doctrine. . . .

*Murphy,* 83 Md.App. at 149, 573 A.2d 853 (quoting *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325, 1336 (D.Md.1989)).

While the purpose of the separation of powers provision is to parcel out and separate the powers of government and confine particular classes of powers to particular branches of the supreme authority, the doctrine can "encompass a

---

**2.** Although not set aside as a separate argument, appellees additionally contend that the cap discriminates against women and African Americans. We held in *Murphy,* however, that C.J. § 11–108 is to be viewed under the "rational basis" test, because there exists no suspect classification, nor is a fundamental right at stake. *Murphy,* 83 Md.App. at 154, 573 A.2d 853. Expanding upon our holding in *Murphy,* we noted that,

[e]ven if [C.J.] § 11–108 were to be viewed as some degree of restriction upon access to the courts, it would be an entirely reasonable restriction, because the legislative classification drawn by [C.J.] § 11–108 between tort claimants whose non-economic damages are less than [the statutory cap] and tort claimants whose non-economic damages are greater than [the statutory cap], and who are thus subject to the cap, is not irrational or arbitrary.

*Owens Corning v. Bauman,* 125 Md.App. 454, 726 A.2d 745 (1999) (quoting *Murphy,* 325 Md. at 366–70, 601 A.2d 102)). For these reasons, appellees' other attacks on the constitutionality of C.J. § 11–108 are without merit.

sensible degree of elasticity and should not be applied with doctrinaire rigor."

*Franklin,* 704 F.Supp. at 1336. (quoting *Dept. of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 220, 334 A.2d 514 (1975)). Following the holding of the Supreme Court of Virginia in *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525 (1989), we held "that [C.J.] § 11–108[did] not violate the separation of powers doctrine." *Murphy,* 83 Md.App. at 150, 573 A.2d 853.

In light of the strong presumption of the constitutionality of statutes, we again refuse to declare C.J. § 11–108 unconstitutional; rather, we affirm the imposition of the cap on appellees' award.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**